FILED
United States Court of Appeals
Tenth Circuit

December 26, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

NADIA MAATOUGUI,

           Petitioner,

v.

ERIC H. HOLDER, JR., Attorney
General,

           Respondent.

Nos. 11-9546 and 12-9529

---

APPEAL FROM THE UNITED STATES
BOARD OF IMMIGRATION APPEALS

---

Sandra Saltrese-Miller, Attorney, Denver, Colorado, for Petitioner.

Charles S. Greene, Trial Attorney, (Derek C. Julius, Senior Litigation Counsel,
with him on the brief) Office of Immigration Litigation, United States Department
of Justice, Washington, D.C., for Respondent.

---

Before **TYMKOVICH**, **HOLLOWAY**, Senior Judge, and **GORSUCH**, Circuit
Judges.

---

**TYMKOVICH**, Circuit Judge.

---

An immigration judge found Nadia Maatougui removable for marriage

fraud in 2004. Maatougui, a native and citizen of Morocco who has lived in the

United States since 2000, then requested asylum and four other forms of relief from removal. In a written decision in 2009, the IJ denied the requests, and the Board of Immigration Appeals affirmed. Maatougui petitioned for our review.

Maatougui claims the IJ and BIA erred in denying her a hardship waiver and cancellation of removal based on their credibility determinations and the weight they gave the evidence in her case. Under our case law, however, we do not have jurisdiction to overturn their credibility determinations or evidence weighing, and thus we cannot grant relief on this claim.

Maatougui also claims that changed conditions in Morocco and the ineffective assistance of her prior counsel at a hearing in 2004 merit reopening her case. But Maatougui has failed to present new, material, previously unavailable evidence that justifies reopening her case. The BIA's decision, while concise, was not insufficient under the circumstances. And the BIA did not abuse its discretion in declining to consider the ineffective assistance claim after Maatougui waited over six years to raise it.

Accordingly, we DISMISS the first claim for lack of jurisdiction, and, exercising jurisdiction under 8 U.S.C. § 1252, we DENY the second.

# I. Background

Nadia Maatougui met her first husband, Khalid Zerougui, in their home country of Morocco. After about two years of marriage, in December 1999, Maatougui left Morocco to visit one of her brothers living in the United States. Maatougui then returned to Morocco, and on May 22, 2000, divorced Zerougui. About twelve days later, she again entered the United States, this time with a six-month visa. Not long thereafter, Zerougui also entered the United States.

After overstaying her visa, Maatougui befriended Joseph Gearhart, a United States citizen, in December 2000. According to Maatougui, the two quickly fell in love, and on May 7, 2001, they were wed at a driver's license bureau in Colorado. Based on this marriage, Maatougui applied for lawful permanent residency on July 9, 2001; the next day, Gearhart signed a visa petition to accompany her application.

Shortly after her marriage to Gearhart, Maatougui became pregnant with a child, born February 28, 2002. The child's father was not Gearhart but Zerougui, Maatougui's former husband. Just before the birth, on January 9, 2002, Zerougui also married a United States citizen and, on that basis, applied for lawful permanent residency, just like Maatougui.

As part of Zerougui's permanent-residency application process, he was interviewed by the Department of Homeland Security. During this interview, Zerougui disclosed that he and Maatougui had a child together. DHS demanded

to see the child's birth certificate, which Zerougui later provided. The certificate confirmed that Zerougui and Maatougui were the parents. Zerougui's wife then withdrew her visa petition for Zerougui, and DHS issued a notice to appear, charging him with removability.

DHS also began investigating Maatougui. It learned that in her interview for legal permanent residency, she failed to disclose her child's birth. It also learned from credit history reports that Maatougui and Zerougui shared the same address, even though, in Maatougui's immigration forms, she listed Gearhart's address as her own. Then, DHS contacted Gearhart's mother and asked about her son's marital status. The mother reported that Gearhart was not married but instead lived with his girlfriend. DHS next contacted Gearhart, who admitted that he married Maatougui in exchange for about $2,500 and that the sole purpose of the marriage was for Maatougui to obtain lawful residency. Gearhart subsequently withdrew his visa petition for Maatougui.

DHS charged Maatougui as removable from the United States. DHS's legal basis for her removal was that Maatougui tried to procure lawful permanent residency through fraud, a violation of 8 U.S.C. § 1182(a)(6)(C)(i) and a deportable offense under 8 U.S.C. § 1227(a)(1)(A). Maatougui denied the removability charge, and an evidentiary hearing on whether Maatougui had committed fraud was set for October 2004.

At the October 2004 hearing, an IJ in Colorado heard testimony from both Gearhart and Maatougui, who was represented by counsel, and the DHS agent who had been investigating Maatougui's residency application. The DHS agent testified first. He explained how the investigation into Maatougui's permanent-residency application began and how he had identified misrepresentations in her application materials, including that she denied having any children in September 2002—almost seven months after her son's birth—and that she listed Gearhart's address as her own when credit history checks showed her living at a different address, one she shared with Zerougui. The DHS agent also explained that "[i]t is very typical for husbands and wives to come [into] the United States . . . separately," and then "both pursue marriage through separate U.S. citizens" to obtain lawful permanent residency "when in reality the[ir] relationship never ceased to exist." Agency R. 430. He said he believed this was the case with Maatougui and Zerougui.

Next, Gearhart took the stand. He testified that his marriage to Maatougui "wasn't real." *Id*. at 447. He said one of Maatougui's brothers living in the United States had approached Gearhart about marrying her and supporting a visa petition for her lawful permanent residency status. The brother offered Gearhart around two to three thousand dollars and explained that the marriage would be "on paper only." *Id.* at 448. Gearhart agreed to the arrangement. He admitted having a "fantasy that something might happen," as he had just been divorced and

-5-

was "kind of lonely." *Id.* But after their brief ceremony at the driver's license bureau, he and Maatougui went their separate ways. They never consummated the marriage, nor did they ever live together. He called the marriage "a scam." *Id.*

Finally, Maatougui took the stand. She maintained that she and Gearhart had, in fact, a bone fide marriage. She presented some photographs to show her and Gearhart's life together, but she admitted that many of the photographs depicted her and others in the same clothing, that all of the photographs were from the summer of 2001, and that she had no other photographs of the family together. As for how she conceived her son, she explained that her encounter with Zerougui was a very brief affair resulting from Gearhart's abusing her and her deciding to flee his home for a short while.

At the conclusion of the October 2004 hearing, the IJ found Gearhart credible and Maatougui not, and he issued a removal order for Maatougui based on her misrepresentations during her residency application process.

Afterwards, Maatougui terminated her counsel at the time and retained new counsel in his stead. Her new counsel assisted Maatougui in filing five different requests for relief from the removal order—requests for asylum, cancellation of removal, withdrawal of removal, relief under the United Nation's Convention Against Torture (CAT), and a hardship waiver for the joint petition requirement of her permanent residency status. Maatougui also asked that the IJ receive additional evidence on Gearhart's credibility and the legitimacy of their marriage.

The IJ agreed, and Maatougui submitted Gearhart's tax returns in which he listed another woman as his wife despite being married to Maatougui at the time.

The IJ also agreed to receive testimony in support of Maatougui's various requests for relief. At another evidentiary hearing, Maatougui presented two experts, Dr. Marjorie Leidig (an expert on battered women) and Professor Shaul Gabbay (an expert on sociology in the Muslim world and Morocco). Dr. Leidig testified that she believed Maatougui was in a bona fide marriage with Gearhart and that Gearhart had in fact abused her. Professor Gabbay testified that Maatougui was at risk of an "honor killing"—where family members kill a disgraced relative—if she returned to Morocco. At the conclusion of the hearing, the IJ granted one more evidentiary hearing at which Maatougui and her mother could testify about the threats Maatougui faced in Morocco as well as the legitimacy of her marriage to Gearhart.

At the third and final evidentiary hearing, Maatougui and her mother both discussed threats Maatougui received from one of her brothers, who they said was a Muslim fundamentalist still living in Morocco. They also discussed concerns with Maatougui's former in-laws (parents of Zerougui), who also still lived in Morocco and allegedly were threatening to take away Maatougui's son.[1]

---

[1] Maatougui conceded, however, that in 2003, she visited Morocco for two or three weeks with her son, and both returned safely.

In addition, Maatougui again testified about her relationship with Gearhart and how she briefly left Gearhart and conceived her son with Zerougui. In the course of her testimony, Maatougui made several statements that were inconsistent with her earlier testimony. For example, she said she fled to a friend's house after Gearhart abused her; but at the previous hearing, she had said it was her brother's house. She said she dated Zerougui for sometime after leaving Gearhart, and that they were intimate about three or four times; but previously she had said they met once and were intimate only once. And she said her son was with her mother when she was interviewed for an adjustment to her immigration status; but before she had said her son was with Zerougui during that time. When confronted with each inconsistency, she offered no explanation.

Also at this last hearing, Maatougui admitted that she and Zerougui had been using the same address, but she explained that the address was her brother's and that her brother allowed Zerougui to use the address for mailing purposes only.

The IJ denied all of Maatougui's applications for relief from the removal order. In his opinion, he explained his credibility determinations. He found Gearhart credible because Gearhart's testimony was consistent with what he had told the DHS agent before the earlier hearing; Gearhart's statements "were made against his penal interest because he knew filing a fraudulent petition . . . was a crime"; and Gearhart gave his testimony "in such a manner that indicated,

although not proud of his actions, he was telling the truth." Agency R. 402. The IJ found Maatougui not credible because she conceived a child with Zerougui only a few weeks after marrying Gearhart, "call[ing] into doubt the validity of the[ir] marriage." *Id.* at 403. He also found Maatougui not credible because she initially listed Gearhart's birth date incorrectly on an immigration form, she failed to list her son on her residency application, and her account of her marriage to Gearhart and her tryst with Zerougui had changed in many significant and unexplained respects. The IJ concluded that Maatougui committed marriage fraud.

As for Maatougui's claims for relief from deportation, the IJ did not find her or Professor Gabbay's testimony sufficient to justify any relief. The IJ noted that Maatougui and her son had traveled to Morocco safely several times since her marriage to Gearhart and that Professor Gabbay could not offer a single example of recent honor killings in Morocco. Nor did the IJ find Dr. Leidig's testimony sufficient to show that Maatougui was abused by Gearhart or that she was in a bona fide marriage with him, especially because Dr. Leidig interviewed only Maatougui during her investigation. The IJ found problematic Dr. Leidig's reliance on Maatougui's "self-serving statements" alone—statements that he already found not credible. *Id.* at 406. At the conclusion of his decision, the IJ ordered Maatougui's deportation to Morocco.

Maatougui timely appealed to the BIA. She challenged the IJ's credibility determinations and his denial of her various applications for relief. Further, she said the IJ failed to review her mother's and significant parts of Professor Gabbay's testimony. She also claimed her due process rights were violated by Gearhart's failure to appear at a hearing in 2007 despite being subpoenaed.

The BIA affirmed all of the IJ's findings and removal order. It rejected Maatougui's complaint that the IJ failed to mention her mother's testimony or parts of Gabbay's testimony, reasoning that the IJ is not required to "write an exegesis." *Id.* at 206. And the BIA concluded that Maatougui received a fundamentally fair hearing, so her due process claim also failed.

Maatougui then petitioned for our review. But before we could decide this first petition, she filed a motion to reopen her case with the BIA. The motion was based on changed conditions in Morocco and the alleged ineffective assistance of her prior attorney at the evidentiary hearing in October 2004. We stayed her first petition until the motion to reopen was resolved.

The BIA then denied her motion to reopen in full. The BIA found that the evidence for changed country conditions was previously available, cumulative, and would not change the outcome. And it found Maatougui's claim of ineffective assistance untimely because both she and her present counsel knew of prior counsel's alleged errors and could have fully aired the claim as much as six years earlier.

As a result, Maatougui filed her second petition with this court, asking that we vacate the BIA's denial of her motion to reopen. Pursuant to 8 U.S.C. § 1252(b)(6), we consolidated both of Maatougui's petitions here.

## II. Analysis

### A. Removal

Maatougui first challenges the BIA's decision to affirm the IJ's order as to her hardship waiver and cancellation of removal requests. She makes essentially three arguments, all of which are, at bottom, about the BIA and IJ's credibility determinations and how they weighed the evidence.[2]

Prior to the Real ID Act of 2005, Pub. L. No. 119–13, Div. B., 119 Stat. 302 (codified in scattered sections of 8 U.S.C. (May 11, 2005)), we reviewed BIA and IJ's credibility determinations for substantial evidence. *See, e.g.*, *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004). But the Real ID Act of 2005 "limit[ed] circuit-court review of credibility findings." *Ismaiel v. Mukasey*, 516 F.3d 1198, 1205 n.5 (10th Cir. 2008).

In particular, under the Act, "we lack jurisdiction . . . to pass on the BIA's credibility determinations and the weight the Board [gives] to certain pieces of

---

[2] The BIA used a single-member opinion to affirm the IJ's order. Thus, although "we will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA[,] . . . we are not precluded from consulting the IJ's more complete explanation of those same grounds." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006).

evidence" when considering requests for a hardship waiver. *Iliev v. Holder*, 613

F.3d 1019, 1022 (10th Cir. 2010). We also lack jurisdiction to review credibility

determinations and evidence weighing for cancellation of removal requests when,

as here, the basis for cancelling removal is a claim that the petitioner was a

battered spouse. *Compare* 8 U.S.C. § 1252(a)(2)(B)(ii) ("no court shall have

jurisdiction to review * * * any other decision or action of the Attorney General

. . . which is specified under [subchapter II of title 8's chapter 12] to be in the

discretion of the Attorney General"), *with* 8 U.S.C. § 1229b(b)(2)(D) (when

reviewing cancellation of removal for a battered spouse, which is a decision under

subchapter II of title 8's chapter 12, "[t]he determination of what evidence is

credible and the weight to be given that evidence shall be within the sole

discretion of the Attorney General"). *See generally Iliev*, 613 F.3d at 1022–23

(explaining how § 1252(a)(2)(B)(ii) withdraws from our jurisdiction certain

credibility determinations and evidence weighing). And because Maatougui's

applications for relief were filed after May 11, 2005, the Act applies. *See

Ismaiel*, 516 F.3d at 1205 n.5.

In her first argument, Maatougui claims she was a victim of domestic

violence while married to Gearhart, and as a battered immigrant, she is protected

by the "relaxed evidentiary standard for relief applications" under the Violence

Against Women Act—evidentiary standards that, she says, the IJ and BIA did not

apply because they failed to give appropriate weight to all "credible evidence." Aplt. Br. at 31 (quoting 8 U.S.C. § 1229b(b)(2)(D)).

But which evidence is credible and how much weight should be given to the evidence are not decisions we can review for a cancellation of removal claim like this one. Thus, even if Maatougui is correct that the IJ and BIA "gave no weight" to testimony suggesting Gearhart abused her, *id.* at 36, we do not have jurisdiction to reevaluate that determination, *see* 8 U.S.C. § 1229b(b)(2)(D).

Maatougui's second argument is framed as a constitutional one, but in fact, it is another challenge to the agency's credibility determinations and evidence weighing. And "a challenge to the agency's discretionary and fact-finding exercises cloaked in constitutional garb . . . remain[s] outside the scope of judicial review." *Kechkar v. Gonzales*, 500 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation marks omitted); *see also Iliev*, 613 F.3d at 1028. Maatougui claims the IJ and BIA violated her constitutional rights because they found her testimony incredible based on her infidelity to Gearhart and because they found Gearhart's testimony credible despite his filing false tax returns. But again, as a challenge to a hardship waiver or a cancellation of removal decision, these are not arguments we have jurisdiction to entertain.[3]

_____

[3] To the extent Maatougui develops a constitutional claim, her legal authority—*Loving v. Virginia*, 388 U.S. 1 (1967) (finding race-based marriage restrictions unconstitutional), and *Revelis v. Napolitano*, 844 F. Supp. 2d 915 (N.D. Ill. 2012) (holding members of Congress may intervene to defend the

(continued...)

-13-

Maatougui's last argument is also about credibility and the weighing of evidence. She claims the IJ and BIA "failed to conduct an adequate review of [her expert Professor Shaul Gabbay's] testimony." Aplt. Br. at 40. She acknowledges that the BIA dismissed Professor Gabbay's conclusion about the frequency of honor killings because Professor Gabbay "could not, when pressed, identify a single specific instance [of honor killings in Morocco]." *Id.* at 40–41 (internal quotation marks omitted). But, she counters, the BIA dismissed Gabbay's conclusion in error because "Professor Gabbay *contradicted* the U.S. State Department report which stated that 'honor crimes . . . remained extremely rare.'" *Id.* at 41 (emphasis in original). Yet the decision to believe one expert (the State Department) over another (Professor Gabbay) is, in its very essence, a decision about the two experts' credibility and the weight to give their evidence—and thus a decision Maatougui cannot challenge here.[4]

---

[3](...continued)
constitutionality of DOMA)—is not relevant here.

[4] Maatougui also appears to challenge the BIA's analysis of Professor Gabbay's testimony with respect to her *asylum* claim. But that issue is irrelevant because Maatougui has not challenged the BIA's decision to deny asylum even if she were otherwise eligible for such relief. To obtain asylum, aliens must pass two stages: first, they must prove eligiblility for asylum; and second, they must "persuade the Attorney General to exercise his discretion and grant [asylum] relief." *Ba v. Mukasey*, 539 F.3d 1265, 1268 (10th Cir. 2008).

In this case, the IJ decided—and the BIA affirmed—that, even if Maatougui were entitled to asylum (first stage), her application would be "properly denied . . . as a matter of discretion" (second stage). Agency R. 205. But Maatougui

(continued...)

In sum, we have no jurisdiction to consider Maatougui's removal claims.

## B. *Motion to Reopen—Country Conditions and Ineffective Counsel*

Maatougui also challenges the BIA's denial of her motion to reopen the case. She presents two bases for her motion. First, she claims changed conditions in Morocco merit revisiting her applications for asylum, withholding of removal, and protection against torture. Second, she claims she was ineffectively assisted by prior counsel at a hearing in October 2004.[5]

---

[4](...continued)
uses Professor Gabbay's testimony—if at all—only to challenge the BIA's eligibility decision, not to challenge the BIA's discretionary decision. Thus, even if we agreed with Maatougui's challenge as to her eligibility, we could not grant relief in light of the BIA's unchallenged exercise of its discretion.

[5] Maatougui also argues that the BIA's decision should be reversed because the BIA reviewed her motion with a one-member instead of a three-member panel. Her authority is 8 C.F.R. § 1003.1(e)(6) (West 2013), but that regulation does not *mandate* three-member panels. Rather, it outlines the "only" circumstances under which a case "*may . . . be* assigned for review by a three-member panel . . . ." *Id.* (emphasis added); *see also Bropleh v. Gonzales*, 428 F.3d 772, 779 (8th Cir. 2005) (concluding the BIA's decision not to refer an appeal to a three-member panel is "discretionary," thus depriving the court of jurisdiction to review the decision). *But see Purveegiin v. Gonzales*, 448 F.3d 684, 692 (3d Cir. 2006) ("The decision to employ single-member review is not a matter 'committed to agency discretion.'"). In any event, Maatougui does not demonstrate that any of the circumstances permitting three-member panels apply here. She claims a panel was necessary both to review "a decision by an [IJ] . . . that is not in conformity with the law or with applicable precedents," and to review "a clearly erroneous factual determination by an [IJ]." Aplt. Br. at 28 (quoting 8 C.F.R. §§ 1003.1(e)(6)(iii), (v)). But the BIA was not reviewing *an IJ's decision* on her motion to reopen—it was reviewing only whether her additional evidence merited reopening the case.

-15-

Before analyzing Maatougui's reasons for reopening the case, we briefly survey our standard of review and the legal background for motions to reopen.

"[W]e review the BIA's decision on a motion to reopen [only] for an abuse of discretion. The BIA abuses its discretion when its decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements." *Infanzon v. Ashcroft*, 386 F.3d 1359, 1362 (10th Cir. 2004) (internal quotation marks omitted). The BIA does not abuse its discretion when "its rationale is clear, there is no departure from established policies, and its statements are a correct interpretation of the law," even when the BIA's decision is "succinct." *Id.*

"There is a strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases." *INS v. Abudu*, 485 U.S. 94, 107 (1988). And "the reasons for giving deference to agency decisions on petitions for reopening . . . in other administrative contexts apply with even greater force in the [immigration] context." *Id.* at 110. Accordingly, motions to reopen immigration cases are "plainly disfavor[ed]," and Maatougui bears a "heavy burden" to show the BIA abused its discretion. *Id.*

To merit reopening her case, Maatougui "must 'state the new facts that will be proven at a hearing to be held if the motion is granted,'" and she must support those facts with "'affidavits or other evidentiary material.'" *Xiu Mei Wei v.*

-16-

*Mukasey*, 545 F.3d 1248, 1251 (10th Cir. 2008) (quoting 8 U.S.C.

§ 1229a(c)(7)(B) (2008)).

And not just any new facts will do. The new facts Maatougui presents must

demonstrate that "if proceedings before the [IJ] were reopened, with all the

attendant delays, the new evidence offered would likely change the result in the

case." *In re Coelho*, 20 I. & N. Dec. 464, 473 (B.I.A. 1992). Even then, "the

BIA has discretion to deny a motion to reopen [though] the alien has made out a

prima facie case for relief." *Abudu*, 485 U.S. at 105–06.

We now turn to the evidence Maatougui presented to see whether the BIA

abused its discretion in declining to reopen her case.

### 1. *Changed Country Conditions*

Maatougui's first basis for reopening her case is that conditions in Morocco

have changed since the IJ's final decision in June 2009.

To support this claim, Maatougui presented the BIA with nine exhibits that,

she says, justify asylum, withholding of removal, and protection from torture (*i.e.*,

relief under the CAT).[6] "To be eligible for asylum, an alien must establish by the

---

[6] Maatougui's evidence consisted of (1) a report by Professor Rachel Newcomb on Morocco's conditions since the Arab Spring, (2) a copy of Maatougui's 2011 asylum application, (3) her own sworn declaration, (4) the transcript of her mother's testimony at an earlier hearing, (5) a declaration from her mother, (6) three news articles from 2011, (7) one news article from 2005, (8) an excerpt from the State Department's April 2011 report on Morocco, and (9) photographs of one of her brothers in what appears to be the uniform of a Moroccan law enforcement officer.

preponderance of the evidence that he or she is a refugee." *Rivera-Barrientos v. Holder*, 666 F.3d 641, 645–46 (10th Cir. 2012). "An applicant may obtain refugee status in one of three ways," including, as relevant here, "through evidence of a well-founded fear of future persecution." *Id.* at 646.

Eligibility for withholding of removal requires a showing of evidence "more stringent tha[n] the showing required for asylum." *Zhi Wei Pang v. Holder*, 665 F.3d 1226, 1233 (10th Cir. 2012). Because we ultimately conclude that the BIA did not abuse its discretion in finding Maatougui's evidence insufficient for asylum relief, we do not address withholding of removal further.

Finally, "[t]o be eligible for relief under the CAT, an individual must 'establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Id.* at 1233–34 (quoting 8 C.F.R. § 208.16(c)(2) (2000)). Because Maatougui does not provide any new evidence of a risk that she will be tortured in Morocco, we also do not address her claim for relief under the CAT.

Citing 8 C.F.R. § 1003.2(c)(1), which states the BIA's standard for reviewing motions to reopen,[7] the BIA gave three reasons why Maatougui's evidence did not merit reopening her case under any theory of relief: (1) "most of

---

[7] The regulation provides, "A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing . . . ." 8 C.F.R. § 1003.2(c)(1) (West 2013).

the additional evidence . . . was previously available," (2) "the evidence is cumulative in nature," and (3) "the evidence . . . would not change the outcome." Agency R. 4.

Maatougui objects to the BIA's analysis for two reasons. Her first objection is that the BIA either misread or failed to review her new evidence. But our review of the record confirms each of the BIA's reasons for denying the motion.

Turning to the BIA's first reason, it is indeed the case that "most of [Maatougui's] additional evidence . . . was previously available." *Id.* The IJ's decision was issued on June 4, 2009. But the information in at least five of Maatougui's nine exhibits was available *before* that date: her asylum application, while filed in 2011, merely reiterates her earlier testimony to the IJ; her sworn declaration, submitted with her 2011 asylum application, also rehashes what she said before the IJ previously; the transcript of her mother's testimony is from 2008; her mother's sworn declaration, though dated June 18, 2011, also provides only evidence that was previously available; and one news article is from 2005. Maatougui does not explain why these five exhibits were not submitted before.

The BIA's other two reasons for rejecting Maatougui's claim of changed country circumstances—that "the evidence is cumulative in nature," and that "the evidence . . . would not change the outcome"—apply to Maatougui's remaining four exhibits.

*First*, the three news articles from 2011 do not contain any material, non-cumulative information. The first article describes how one Moroccan woman set herself on fire after the government denied her a permit to build on land adjacent to her father's land. But this incident does not demonstrate the basis for a well-founded fear of retaliation in Maatougui's case.

The second article describes how, since 2009, "[d]ivorced women in the workforce and unemployed women at home [] face higher instances of violence." *Id.* at 123. But these new facts do not make a prima facie case for asylum. The first requirement for asylum eligibility is being a "refugee," which means being "unable or unwilling to return . . . 'because of . . . a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Rivera-Barrientos*, 666 F.3d at 645–46. And gender alone is not a sufficiently distinct "social group" on which to base a "refugee" finding. *See Niang v. Gonzales*, 422 F.3d 1187, 1199 (10th Cir. 2005) ("One may be reluctant to permit . . . half a nation's residents to obtain asylum on the ground that women are persecuted there."). Even if we re-characterized the relevant social group as "divorced single mothers previously married to a Westerner," as Maatougui requests, the evidence from this article does not mention anything about former wives of Westerners, and the article's reference to divorced women experiencing "higher instances of violence" in general is not

-20-

sufficiently "direct[] and specific" to "support a reasonable fear" of Maatougui's persecution. *Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir. 2004).

The third 2011 article says nothing about persecution to anyone fitting into Maatougui's "social group" or any other possible group for her asylum claim, nor does it illustrate a torture threat for Maatougui.

*Second*, Professor Newcomb's two-page report for Maatougui contains both cumulative and immaterial evidence. The only new evidence in Professor Newcomb's report are allegations that the "chaos and lawlessness of the political situation [post-Arab Spring] mean that the rule of law is even less likely to be followed," and that "the King of Morocco recently released 190 political prisoners, many of whom are Islamists." Agency R. 80–81.

But greater lawlessness in general does not show persecution of a protected class, as is required for asylum relief. Nor does the allegation about released prisoners. It is unclear how many of the 190 recently released prisoners are Islamist—Professor Newcomb merely says "many" are. And it is unclear how the presence of more Islamists in Morocco justifies a well-founded fear for Maatougui, as she has presented no evidence of Islamists in particular posing danger to a protected class to which she belongs.

*Third*, the excerpt from the State Department's 2011 report on Morocco also does not contain non-cumulative information. The IJ and BIA had previously relied upon a 2005 State Department report on Morocco, so the 2011 report is

relevant to Maatougui's motion only if it presents material facts that were unavailable in the prior report. To that end, Maatougui claims the State Department's 2011 report adds new insights on the "unequal treatment of women" and the lack of protection against rape. Aplt. Br. at 21–22.

But these details are not new. The 2005 State Department report also noted the unequal treatment of women in Morocco—"[e]ven in cases in which the law provides for equal status." Agency R. 851. And it described the lack of protection against rape and the practice of "[rape] victim[s'] families . . . offer[ing] rapists the opportunity to marry their victims in order to preserve the honor of the family." *Id.* Because the 2011 report is cumulative, Maatougui cannot use it to justify reopening her case.

The *fourth* and final remaining exhibit is a collection of photographs purportedly taken of one of Maatougui's brothers dressed in what appears to be Moroccan law enforcement attire. But in 2008, Maatougui testified before the IJ that one of her brothers was in Moroccan law enforcement. And she does not explain how these photographs are anything more than cumulative (let alone not previously available). Accordingly, the BIA's reasons for denying her motion to reopen apply to this evidence, too.

Maatougui's counter-arguments are unpersuasive. She says that her mother's testimony is clear evidence that Maatougui will face persecution upon deportation. But Maatougui needs evidence that was *not previously available* to

justify reopening her case. Maatougui also says the BIA failed to address "critical" polygraph test results that she submitted with her motion to reopen. Aplt. Br. at 27. But by her own admission, this evidence was previously available, *see* Agency R. 38, and thus is inappropriate for a motion to reopen.

Finally, Maatougui claims the decision in *Fessehaye v. Gonzales*, 414 F.3d 746 (7th Cir. 2005), dictates granting relief on this record. In *Fessehaye*, the Seventh Circuit reversed the BIA's denial of a motion to reopen where the petitioner "clearly supplied evidence of the quality and quantity that the Board reasonably could expect" to show her "'new fact,'" namely, "her decision to convert to her husband's faith," Jehovah's Witness. *Id.* at 755. But the point here is that Maatougui presented no new facts relevant to her removal petition.

In short, Maatougui's first objection—that the BIA did not properly assess her evidence—is unavailing.

Maatougui's second objection is that the BIA's reasoning is too brief and conclusory to permit meaningful appellate review. To be sure, the BIA's reasoning for her changed-conditions claim is succinct. But that, by itself, is not an abuse of discretion. *See Infanzon*, 386 F.3d at 1362 (noting a "succinct" decision is not necessarily an abuse of discretion); *see also Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1289 (11th Cir. 2003) ("That a one-sentence order was entered is no evidence that the BIA member did not review the facts of Mendoza's case."). The BIA is not required to "write an exegesis on every

contention. What is required is [] that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Becerra-Jimenez v. INS*, 829 F.2d 996, 1000 (10th Cir. 1987) (internal quotation marks omitted). And here, as our foregoing discussion about Maatougui's first objection illustrates, the BIA's reasoning is in fact sufficient for meaningful appellate review.

Maatougui also argues that our need to examine the record shows that the BIA's rationale was insufficiently articulated, because, as she rightly points out, we may not search the record for reasons to support the BIA's decision. Aplt. Br. at 15 (citing *Mickeviciute v. INS*, 327 F.3d 1159, 1162–63 (10th Cir. 2003)). But while she cites the correct rule, she misapplies it here. We are not searching the record for the BIA's reasons; its three reasons are clear. Rather, we are searching the record to see if it supports those reasons. *Cf. Jimenez-Guzman v. Holder*, 642 F.3d 1294, 1298 (10th Cir. 2011) (finding the BIA did not abuse its discretion in part because "the record . . . belie[d]" the petitioner's claims).

Maatougui's second objection to the BIA's reasoning—that it is insufficient for appellate review—does not merit remand. In sum, Maatougui has failed to show that the BIA abused its discretion in denying her motion to reopen based on changed country conditions.

## 2. *Ineffective Assistance of Counsel (IAC)*

Maatougui's second basis for reopening her case is that her first counsel rendered ineffective assistance in 2004. To support this IAC claim, Maatougui highlights two alleged errors: first, counsel instructed her not to file a Form I-751 (petition to remove conditions on residency); and second, during her October 2004 evidentiary hearing, counsel failed to impeach Gearhart with Gearhart's false 2003 tax returns (where he listed his girlfriend as his wife even though he was legally married to Maatougui at the time).

The BIA dismissed this ground for reopening the case because Maatougui had not shown "due diligence" in pursuing the claim by "wait[ing] over 6 years to file such a motion." Agency R. 4. It explained, "[Maatougui's] current counsel has represented [her] since the end of 2004. If current counsel believed that ineffective assistance of former counsel occurred prior to that time, current counsel could have made such a claim to the Immigration Judge, or to the Board during the pendency of the appeal." *Id.*

Maatougui objects to the BIA's decision for two reasons. Her first objection is that the BIA's reasoning "runs afoul of well-settled law [] that the petitioner who is asserting ineffective of [sic] assistance must exhaust his/her remedies." Aplt. Br. at 28. She explains, "[T]he matter was not yet ripe to assert ineffective assistance of counsel" at the time she learned of her prior counsel's

ineffectiveness because "there was no final order and [Maatougui] could not foresee that she would not prevail on her claims for relief." *Id.* at 29.

Her authority is *In re Lozada*, 19 I. & N. Dec. 637 (B.I.A. 1988), which establishes the procedure for asserting an IAC claim in an immigration case. But the *Lozada* opinion does not require a petitioner to wait until a motion to reopen with the BIA in order to raise an IAC claim.

Indeed, Maatougui could have raised her IAC claim in a motion to reopen with the IJ after the decision in 2004 or after the decision in 2009. *See* 8 C.F.R. § 1003.23(b)(1) (West 2013) ("An [IJ] may . . . upon motion of the . . . alien, reopen . . . any case in which he or she has made a decision . . . ."); *see also Khrystotodorov v. Mukasey*, 551 F.3d 775, 784–85 (8th Cir. 2008) (affirming an IJ's denial of a motion to reopen). The BIA said as much—"current counsel could have made such a claim to the Immigration Judge." Agency R. 4.

Such an approach is not novel in this circuit. *See Hernandez v. Holder*, 412 F. App'x 155 (10th Cir. 2011) (petitioners raised their IAC claim in a motion to reopen before the IJ, which the IJ denied and the BIA later affirmed). Nor can Maatougui point us to a judicial opinion or regulation requiring IAC claims in immigration cases to be raised only after appeal to the BIA.

Moreover, we have long observed that "[r]emovable aliens are not permitted to delay matters by pursuing multiple avenues of relief seriatim when no reason suggests why they could not be pursued simultaneously." *Galvez*

-26-

*Pineda v. Gonzales*, 427 F.3d 833, 839 (10th Cir. 2005). Here, no reason suggests why Maatougui could not have brought her IAC claim when she raised her other grounds for relief in 2005 or before she appealed the IJ's decision in 2009. To the contrary, the record demonstrates she could have brought her claim at either point. On July 11, 2005, she signed a sworn affidavit explaining she did not file a timely I-751 because "my first attorney . . . advised against it." Agency R. 869. And on July 12, 2005, she moved that the IJ admit Gearhart's 2003 tax returns—the very documents her prior counsel failed to present at the October 2004 hearing. *See id.* at 857–58. Thus, by 2005, she was aware of both alleged errors that now make up her IAC claim.

In fact, Maatougui already tested the waters with this IAC claim at hearings before the IJ in 2006 and 2008. In 2006, Maatougui's present counsel informed the IJ that she was going to raise a "*Lozada* type claim, whereby the previous attorney was ineffective" based on his failure to file a Form-751 and his failure to confront Gearhart with his 2003 tax returns at the October 2004 hearing. *Id.* at 565; *see also id.* at 628. The IJ then invited Maatougui's current counsel to "bring more evidence" to correct prior counsel's alleged errors, which she did by submitting Gearhart's 2003 tax returns. But the IJ also explained that, as to the IAC claim itself, he was not likely to find prejudice because "it was basically just a question of credibility of the witnesses[, a]nd I found that [Gearhart] was credible." *Id.* at 566–67.

Then, at a hearing in 2008, Maatougui's present counsel reiterated, "Mr. Gearhart perjured himself . . . as indicated by his tax forms. . . . [And] prior counsel . . . never challenged him, never investigated it thoroughly. And my client was hung out to dry, because of the negligence of [prior counsel]." *Id.* at 646–47. To this second ineffective-assistance reference, the IJ responded, "Well I'll address that, too. But . . . I think I'm going to have to do a written decision," *id.* at 647, a decision he issued the following year.

Although the IJ did not, in his final written decision, explicitly address these attempts at an IAC claim, Maatougui did not move for the IJ to reconsider or reopen her case, nor did she raise the IJ's failure in her direct appeal. Instead, she waited until a motion to reopen with the BIA. But Maatougui is "not permitted to delay matters by pursuing multiple avenues of relief seriatim," *Galvez Pineda*, 427 F.3d at 839—at least, not without an adequate explanation for her delay. And she offers no such explanation here.

In sum, Maatougui could have asserted her IAC claim to reopen the case immediately after the IJ found her removable in 2004 or immediately after he denied relief from removal in 2009. Therefore, she cannot show, as she must, that her "evidence sought to be offered . . . was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1).

Her second objection is that the BIA misconstrued her motion as untimely. She notes that the BIA cited three opinions from our court in support of its

-28-

decision to reject her IAC claim. But, she explains, those three cases all addressed motions to reopen filed after the statutory period of ninety days. Here, by contrast, her motion was filed within the ninety-day period.

Maatougui is correct—the three cases cited by the BIA all involved untimely motions,[8] whereas Maatougui's motion to reopen her case with the BIA was timely. But while the BIA cited the wrong cases, it did not apply the wrong regulation. The BIA relied on 8 C.F.R. § 1003.2(c)(1), which directs the BIA not to grant motions to reopen unless the evidence presented was not available and could not have been presented earlier. And the BIA did not misapply that regulation. As outlined above, Maatougui knew of her IAC claim and the supporting evidence and could have presented the claim and evidence years earlier.

Nor does our decision in *Osei v. INS*, 305 F.3d 1205 (10th Cir. 2002), demand a different result. In *Osei*, we held that the BIA abused its discretion when it denied a motion to reopen by "mere citation" to 8 C.F.R. § 1003.2(c)(1).[9] *Osei*, 305 F.3d at 1208. The government argued that § 1003.2(c)(1) prevents an

---

[8] The three cases cited by the BIA were *Mahamat v. Gonzales*, 430 F.3d 1281, 1283 (10th Cir. 2005), *Infanzon*, 386 F.3d at 1362–63, and *Riley v. INS*, 310 F.3d 1253, 1257–58 (10th Cir. 2002).

[9] When we decided *Osei*, the applicable regulation was 8 C.F.R. § 3.2(c)(1). The regulation was renumbered in 2003. *See* 68 Fed. Reg. 9824, 9846 (Feb. 28, 2003) ("All references in part 1003 to '§ 3.' are revised to read '§ 1003.'.").

alien from asserting an IAC claim "if the evidence of counsel's ineffectiveness was available on direct appeal." *Id.* at 1208–09. We did not address whether Osei and his new counsel actually knew of his prior counsel's errors at the time of Osei's direct appeal. Rather, we rejected the government's argument because the government could not cite a single case in which the BIA "denied a motion to reopen raising a claim of ineffective assistance on the basis that the motion to reopen fails to comply with § [100]3.2(c)(1)." *Id.* at 1209. Nor could we find such a case at the time. To the contrary, we found that the BIA then "regularly evaluated such motions to reopen based merely on whether they satisfy the requirements set out in *Lozada*," not based on whether § 1003.2(c)(1) applied. *Id.*

But here, it is clear that both Maatougui and her present counsel knew of prior counsel's alleged ineffective assistance before the appeal—indeed, well before the IJ's final decision itself. And Maatougui seeks only to introduce essentially the same evidence that was available to the IJ years earlier, the one exception being results from a polygraph test, which Maatougui admits could have been submitted previously, too. *See* Agency R. 38.

A similar situation arose in *Gui Qin Wang v. Holder*, 389 F. App'x 68 (2d Cir. 2010), an unpublished decision where the BIA denied a motion to reopen for an IAC claim because the petitioner failed to raise her IAC claim with the IJ or on her direct appeal. In *Wang*, as here, "both [the petitioner] and her new attorney were aware of the alleged ineffective assistance *before* filing her appeal to the

-30-

BIA." *Id.* at 70 (emphasis added). Accordingly, explained the Second Circuit, "the BIA reasonably determined that [the petitioner's] evidence was not previously unavailable," so the BIA "did not abuse its discretion in denying her motion to reopen." *Id.*

*Wang* is consistent with the rule in other circuits. For example, in *Toure v. Holder*, 624 F.3d 422 (7th Cir. 2010), the BIA denied the petitioner's motion to reopen in part because the petitioner failed to establish that the key piece of evidence for his IAC claim was previously unavailable. *Id.* at 431. Citing the same regulation at issue here—8 C.F.R. § 1003.2(c)(1)—as well as testimony showing that the petitioner did in fact know of this key evidence before his appeal, the Seventh Circuit concluded the BIA did not abuse its discretion in denying the motion on that basis. *Id.* Similarly, in *Massis v. Mukasey*, 549 F.3d 631 (4th Cir. 2008), the BIA denied another petitioner's motion to reopen and reconsider based on ineffective assistance where the petitioner "had failed to 'file a motion to reopen within a reasonable period of the alleged ineffective assistance.'" *Id.* at 634 (quoting the BIA). The Fourth Circuit also concluded that the BIA had not abused its discretion in denying on that basis. *Id.* at 637.

What is more, the BIA in this case did more than merely cite to 8 C.F.R. § 1003.2(c)(1). It specifically referenced Maatougui's and present counsel's awareness of this claim years earlier and the opportunity they had to raise this claim before the IJ or on direct appeal. And given the clear authority for motions

to reopen and motions to reconsider before the IJ, *see* 8 C.F.R. § 1003.23(b)(1), Maatougui in fact failed to demonstrate due diligence by not raising this IAC claim in a timely motion after either of the IJ's decisions.

Consequently, though *Osei* addressed a similar issue, it does not require the same result. The BIA in this case did not abuse its discretion in denying a motion to reopen based on the IAC claim presented here.

## III. Conclusion

For the foregoing reasons, we DISMISS for lack of jurisdiction Maatougui's petition to review the BIA's decision on her removability, and we DENY her petition to review the BIA's denial of her motion to reopen the case.