**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 28, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

HUGO RODRIGUEZ-CASILLAS, a/k/a
Armando Lopez,

     Petitioner,

v.

LORETTA LYNCH, United States
Attorney General,[1]

     Respondent.

No. 14-9531
(Petition for Review)

_____

**ORDER AND JUDGMENT**[**]
_____

Before **KELLY**, **EBEL**, and **LUCERO**, Circuit Judges.
_____

Hugo Rodriguez-Casillas petitions for review of a decision by the Board of

Immigration Appeals ("BIA") denying his application for withholding of removal

and protection under the Convention Against Torture ("CAT").  Exercising

jurisdiction under 8 U.S.C. § 1252(a), we deny his petition.

**I**

Rodriguez-Casillas is a citizen of Mexico.  After pleading guilty to trespass to

_____

[1] Loretta Lynch is substituted as the respondent pursuant to Fed. R. App. P.
43(c)(2).

[**] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

an automobile in Colorado state court, he was removed to Mexico in 2005.  He re-entered the United States without authorization on January 29, 2008 and was apprehended by Department of Homeland Security ("DHS") personnel.

According to a "Form I-213" prepared by Border Patrol Agent Roxanne Ross on January 29, 2008, Rodriguez-Casillas had numerous lacerations on his face and back.  Rodriguez-Casillas stated that he had been attacked the previous Saturday "in Ciudad Juarez by Barrio Azteca gangmembers [sic] for allegedly no apparent reason."  He declined medical treatment, indicating that he had received care in Mexico, and stated he "does not fear harm or persecution if returned to his native country of Mexico."

Ross also prepared a "Form I-215B" affidavit on January 30, 2008, which Rodriguez-Casillas signed and initialed.  Although this form indicates that Ross interviewed Rodriguez-Casillas in Spanish, it is printed in English.  The form recounts that Rodriguez-Casillas was advised that he had a right to remain silent and that his statements could be used against him in court or in an immigration proceeding.  When asked whether he feared persecution upon return, Rodriguez-Casillas answered under oath, "[w]ell, yes," indicating he feared "[t]he ones that kill people for money" if he were returned to Mexico.

On April 22, 2008, Rodriguez-Casillas pled guilty to illegal re-entry.  He was sentenced to ten months' imprisonment.  He was interviewed by Deportation Officer Ernesto Garcia on December 1, 2008; this interview is memorialized in a "Record of Sworn Statement in Affidavit Form."  According to this form, Rodriguez-Casillas

was interviewed in Spanish. The form states in both Spanish and English that Rodriguez-Casillas has the right to remain silent and that his statements may be used against him in court or in an immigration proceeding. Most of the questions are printed in English and Spanish, but Rodriguez-Casillas' answers are printed in English only. Rodriguez-Casillas initialed each page, and signed a statement printed in both English and Spanish indicating that he "read (or ha[s] had read to me) the foregoing statement" and affirmed that the answers attributed to him were true and correct. Rodriguez-Casillas also initialed a correction to his birth year.

When asked about his statement from January 30, 2008, that he feared persecution, Rodriguez-Casillas answered, "[i]t's not true, I said that I wanted to go back to Mexico." He also stated "I do not want asylum. I want to go to Mexico." Garcia asked about a previously reported instance of "mistaken identity regarding the Aztecas gang." Rodriguez-Casillas answered that on January 12, 2008, he "was buying some cigarettes in Juarez and . . . was approached by gang members who took [his] cell phone and beat [him] up." After he purchased first aid supplies from a pharmacy, "the same gang members said they thought [he] was someone else and returned [the] cell phone." Rodriguez-Casillas was returned to Mexico the day of his interview.

Sometime in January 2009, Rodriguez-Casillas returned to the United States without authorization. DHS officials encountered him at the Summit County, Colorado jail in December 2012. He was subsequently transferred to DHS custody and interviewed by Immigration Enforcement Agent Pacer Lee on February 15, 2013.

Lee prepared a Form I-215B affidavit, which indicates that Rodriguez-Casillas was interviewed in Spanish after being advised of his rights. Lee's questions are printed in both Spanish and English, but the answers are printed only in English. Rodriguez-Casillas initialed or signed each page of the form. He stated that he feared "the Drug Cartel, because they killed my mother" and that he wished to remain in the United States.

Rodriguez-Casillas then sat for a reasonable fear interview with an asylum officer, in which he made the following claims: The "Federales," Mexico's federal police force, attempted to extort him in January 2008. This extortion began when officers observed him speaking with members of the Aztecas gang and began following him. After he refused their demands for money, the Federales falsely accused him of robbing a store. He was beaten and forced to confess. During his detention in prison, the Federales beat him a second time. He was acquitted of the robbery, but was again attacked by the Federales after being released from custody. Within a few days of this beating, he fled to the United States and was apprehended by immigration authorities. He claims that the Federales killed his mother in January 2009, after he was returned to Mexico.

In August 2013, Rodriguez-Casillas submitted an application for withholding of removal and protection under the CAT. He attached an affidavit to his application detailing his claims of persecution at the hands of the Federales. The affidavit is largely consistent with the testimony he provided at the reasonable fear interview. Rodriguez-Casillas states that the Federales accused him of being a member of the

"Los Aztecas" gang in January 2008 and attempted to extort him, falsely accused him of robbery, and repeatedly beat him. Rodriguez-Casillas also states that he did not seek asylum in January 2009 because he learned while in detention that his mother suffered a stroke and he needed to return to Mexico to see her. Further, he claims that the Federales murdered his mother in January 2009.

Rodriguez-Casillas attached numerous other documents to his petition. Several friends and family members attested to his good character. A physician averred that Rodriguez-Casillas' version of events was consistent with his physical injuries. And a clinical psychologist opined that he demonstrated psychological symptoms consistent with someone who has suffered serious injuries and been threatened with death. Rodriguez-Casillas also produced a death certificate indicating that his mother was killed by a gunshot wound to the chest in January 2009 and a judgment of acquittal on robbery charges dated January 12, 2008. Lastly, he attached a single page from the Form I-213 that was prepared in January 2008.

At a hearing before an Immigration Judge ("IJ") held on September 5, 2013, Rodriguez-Casillas again testified to the Federales' harassment of himself and his family. During cross-examination, the government requested permission to introduce previously prepared immigration forms to impeach Rodriguez-Casillas. Rodriguez-Casillas objected that such submissions would be untimely, and requested an opportunity to review the submission before completing his testimony. The IJ ruled that the documents could be used for impeachment and that Rodriguez-Casillas

would have an opportunity to rebut the evidence after reviewing it. The IJ continued the hearing to October 4, 2013.

The government submitted a packet of impeachment evidence on September 13, 2013, one day after the deadline set by the IJ. It included the I-213 and I-215B forms described above. Rodriguez-Casillas filed an objection to the untimely filing, arguing that Immigration Court rules require all evidence to be submitted prior to a hearing, and that the late filing would cause prejudice. The IJ accepted the late filing on September 18, 2013. At a hearing held on October 3, 2013, the documents were made part of the administrative record. The IJ scheduled further testimony for October 25, 2013. At that hearing, counsel stated that Rodriguez-Casillas was prepared to testify about tattoos the government claimed were gang-related, but declined to take the stand after the IJ indicated that subject had already been covered on direct examination. The IJ heard testimony from Rodriguez-Casillas' wife and brother.

In an oral decision, the IJ denied relief, finding that Rodriguez-Casillas was not credible. The IJ based this finding on the discrepancies between Rodriguez-Casillas' statements and testimony made in support of his application and the accounts he previously gave to immigration authorities as reflected in the immigration forms submitted by the government. Specifically, although Rodriguez-Casillas claimed he was beaten by the Federales in January 2008, immigration records from 2008 and 2009 reflected that he attributed his January 2008 injuries to an attack by members of the Aztecas gang. The IJ characterized these stories as "two

entirely different factual scenarios that cannot be reconciled." He accordingly denied both withholding of removal and relief under the CAT.

Rodriguez-Casillas appealed the decision to the BIA. He argued that the IJ's acceptance of the government's late submission violated his due process rights, that the IJ's adverse credibility finding was not supported by the record, and that the IJ failed to consider his documentary evidence. The BIA dismissed his appeal. It concluded that the immigration forms were properly admitted, that the discrepancies between Rodriguez-Casillas' prior statements to immigration officials and his testimony supported an adverse credibility finding, and that the IJ's findings were sufficient given that Rodriguez-Casillas' claims were "based on the same discredited testimony" and he failed to explain how "a particularized analysis of his corroborative evidence would outweigh his earlier statements made to immigration authorities in evaluating the veracity of his claim." Rodriguez-Casillas now petitions for review of the BIA's decision.

## II

When a single member of the BIA issues a decision under 8 U.S.C. § 1003(e)(5), we review that decision as the final order of removal, but may consult the IJ's decision to the extent the BIA relied upon or incorporated it. Sarr v. Gonzales, 474 F.3d 783, 790 (10th Cir. 2007). We review constitutional and legal questions de novo. Elzour v. Ashcroft, 378 F.3d 1143, 1150 (10th Cir. 2004). We review an adverse credibility finding and findings of fact for substantial evidence. Razkhane v. Holder, 562 F.3d 1283, 1287 (10th Cir. 2009).

To establish eligibility for withholding of removal, a petitioner must show a threat to "life or freedom" based on "race, religion, nationality, membership in a particular social group, or political opinion." § 1231(b)(3)(A). If the petitioner establishes past persecution, there exists a rebuttable presumption of future persecution. § 1208.13(b)(1). Absent past persecution, a petitioner must show a clear probability of future persecution. See Zhi Wei Pang v. Holder, 665 F.3d 1226, 1233 (10th Cir. 2012). "To be eligible for relief under the CAT, an individual must establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." Id. at 1233-34 (quotation omitted).

## A

Removal proceedings must provide some procedural due process protections. Reno v. Flores, 507 U.S. 292, 306 (1993). However, "[b]ecause aliens do not have a constitutional right to enter or remain in the United States, the only protections afforded are the minimal procedural due process rights for an opportunity to be heard at a meaningful time and in a meaningful manner." Arambula-Medina v. Holder, 572 F.3d 824, 828 (10th Cir. 2009) (quotation omitted). "[E]videntiary rules are not strictly applied at immigration hearings." Bauge v. INS, 7 F.3d 1540, 1543 (10th Cir. 1993). "The test for admissibility of evidence in a deportation hearing is whether the evidence is probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." Id. (quotation omitted).[2]

---

[2] Rodriguez-Casillas states in conclusory fashion that a heightened due process test should be applied in this case because he fears that his life is in danger in

We have previously held that a Form I-213 "was probative and its introduction was not fundamentally unfair." Bauge, 7 F.3d at 1543. Other circuits are generally in accord, holding that an I-213 may ordinarily be admitted in immigration proceedings without supporting testimony from its author. See Chavez-Castillo v. Holder, 771 F.3d 1081, 1084 (8th Cir. 2014) ("The officer's affidavit and Form I-213 were probative as they contradicted Chavez-Castillo's assertion . . . [and] [b]oth documents were also presumptively reliable and thus fundamentally fair because they were produced by public officials during the ordinary course of their duties." (quotations omitted)); Pouhova v. Holder, 726 F.3d 1006, 1013 (7th Cir. 2013) ("As a general rule, a Form I-213 is treated as inherently trustworthy and admissible even without the testimony of the officer who prepared it."); Jianli Chen v. Holder, 703 F.3d 17, 23 (1st Cir. 2012) (holding "I-213 form at issue here satisfies the[] criteria" of being "reliable and its use . . . fundamentally fair"); Felzcerek v. INS, 75 F.3d 112, 115 (2d Cir. 1996) ("The Form I-213 . . . [is a] record[] made by public officials in the ordinary course of their duties, and accordingly evidence[s] strong indicia of reliability. This is so because public officials are presumed to perform their duties properly and generally lack a motive to falsify information."); Espinoza v. INS, 45 F.3d 308, 310 (9th Cir. 1995) ("[A] Form I-213 is probative on the issue of entry, and its admission is fair absent evidence of coercion or that the statements are not those of the petitioner."); see also In re Ponce-Hernandez, 22 I. & N. Dec. 784, 785 (BIA

Mexico. However, we generally will not consider "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." Murrell v. Shalala, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994).

1999) ("It has been held that, absent any evidence that a Form I-213 contains information that is incorrect or was obtained by coercion or duress, that document is inherently trustworthy and admissible as evidence to prove alienage or deportability."). And the Supreme Court has acknowledged, albeit in dicta, that when an immigration officer "completes a 'Record of Deportable Alien' [i.e., a Form I-213] that is introduced to prove the INS's case at the deportation hearing . . . the officer rarely must attend the hearing." INS v. Lopez-Mendoza, 468 U.S. 1032, 1049 (1984).

However, several courts have concluded that particular problems with a Form I-213 or similar documents may render them inadmissible. For example, in Pouhova, the Seventh Circuit concluded a Form I-213 was unfairly admitted and unreliable because: (1) it was prepared seven years after the conversation it reports; (2) it differed sharply from the affidavit upon which it was based; (3) it was based on an interview conducted without a translator; and (4) "its critical information was obtained from someone other than the subject of the form." 726 F.3d at 1013-15. Similarly, in Anim v. Mukasey, 535 F.3d 243 (4th Cir. 2008), the court concluded that a letter from a State Department official relaying the results of an investigation should not have been admitted in an immigration proceeding. Id. at 250, 256. The document contained hearsay within hearsay from officials in the government from which the alien was fleeing, who may have had an interest in misleading investigators. Id. at 257. Further, the document did not reveal the identity of the investigator, the investigator's methods, or how the investigator's conclusions were

-10-

reached.  Id. at 257-58; see also Ezeagwuna v. Ashcroft, 325 F.3d 396, 406-08 (3d Cir. 2003) (rejecting similar letter for same reasons); Murphy v. INS, 54 F.3d 605, 610-11 (9th Cir. 1995) (concluding an unauthenticated I-213 was due little evidentiary weight because it provided hearsay from an individual other than the alien, was recorded well after the information was gathered, and contained unexplained alterations).

As the foregoing cases indicate, courts have been especially reluctant to admit a Form I-213 if "the information recorded in it was obtained by someone other than the alien himself." Rosendo-Ramirez v. INS, 32 F.3d 1085, 1088 (7th Cir. 1994). But many factors may render a Form I-213 problematic:  "[I]t may contain information that is known to be incorrect, it may have been obtained by coercion or duress, it may have been drafted carelessly or maliciously, [or] it may mischaracterize or misstate material information or seem suspicious." Pouhova, 726 F.3d at 1013.

Some courts have qualified their statements about I-213 forms by stating that the documents are admissible "at least when the alien has put forth no evidence to contradict or impeach the statements in the report." Felzcerek, 75 F.3d at 117; see also Bustos-Torres v. INS, 898 F.2d 1053, 1056 (5th Cir. 1990) ("Official INS documents have been admitted in deportation proceedings without being identified by the signer when the person to whom the document refers does not attempt to impeach the information in the document.").  However, several circuits have held that an IJ may properly admit a Form I-213 that contains information contradicting an alien's

account. In Jianli Chen, the First Circuit upheld an adverse credibility finding that turned on discrepancies between the petitioners' testimony and the statements contained in a Form I-213, concluding that the form was reliable on its face. 703 F.3d at 23, 25. And in Chavez-Castillo, the Eighth Circuit held that an IJ permissibly admitted a Form I-213 to rebut an alien's affidavit without allowing for cross-examination of the document's author. 771 F.3d at 1083, 1085. "[A]side from [the alien]'s self serving statements in his affidavit," the court noted, "he presents no evidence controverting the accuracy of the . . . Form I-213." Id. at 1085.

Regardless of whether testimony from an alien inconsistent with information contained in a Form I-213 would generally render that form inadmissible absent an opportunity to cross-examine its author, we conclude that the admission of the challenged documents was fundamentally fair under the unique facts of this case. Rodriguez-Casillas' account obviously differs from the version of events contained in the immigration forms at issue. However, Rodriguez-Casillas elected not to testify after the challenged documents were provided to him. His only direct testimony about his remarks to immigration officials occurred before the documents at issue were disclosed. In an affidavit, he stated: "I told American authorities I was scared to return to Mexico because I was beaten and tortured by the [F]ederales." Additionally, Rodriguez-Casillas himself submitted one page of the Form I-213 that was prepared in January 2008. That page indicates that he was injured in a "fist fight while in Mexico." When the IJ asked about this record, Rodriguez-Casillas responded that he told Border Patrol agents that the Federales were trying to kill him.

Several factors weigh in favor of the fundamental fairness of introducing the immigration forms under these circumstances. First, the government introduced the 2008 forms as impeachment evidence only after Rodriguez-Casillas put at issue the statements he made to immigration authorities and introduced a portion of one of the forms he now claims are inadmissible. The Federal Rules of Evidence do not apply in immigration proceedings. See N-A-M v. Holder, 587 F.3d 1052, 1057-58 (10th Cir. 2009). But we note that the Rules provide: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106; see also Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 171-72 (1988) (discussing the common law "rule of completeness" upon which Rule 106 is based). We have thus held that "it is fundamental that one side may introduce only a part of a document or deposition in evidence, but of course it is also well recognized that the other side may later introduce more or the rest of any such document or deposition which was not introduced in evidence." United States v. Phillips, 543 F.3d 1197, 1203 (10th Cir. 2008) (quotation and alteration omitted). Having brought into evidence part of the January 2008 immigration document without the author's testimony, it strains credulity for Rodriguez-Casillas to argue that it was fundamentally unfair for the government to introduce the remaining pages of that document in the same manner. And although Rodriguez-Casillas did not introduce any portion of the December 2008 forms, they are largely cumulative of the January 2008 documents. The key

-13-

point in both sets of documents is that Rodriguez-Casillas claimed he was attacked in January 2008 by members of the Aztecas gang, rather than by the Federales.[3]

The fact that Rodriguez-Casillas possessed a portion of the January 2008 Form I-213 prior to his hearing also cuts strongly against his claim of unfair surprise. As impeachment evidence, the form was not subject to the same disclosure requirements as direct evidence. See Urooj v. Holder, 734 F.3d 1075, 1079 n.5 (9th Cir. 2013) (noting that the Immigration Court Practice Manual permits impeachment evidence to be admitted without ordinary disclosure requirements being met); see also Fed. R. Civ. P. 26(a)(1)(B) (exempting impeachment evidence from ordinary disclosure rules). Nevertheless, due process requires the "opportunity to be heard at a meaningful time and in a meaningful manner." Arambula-Medina, 572 F.3d at 828 (quotation omitted). Because Rodriguez-Casillas possessed at least some of the documents at issue and included in his affidavit claims about his statements to immigration officials, he should have been aware that those statements would be subject to impeachment. The IJ granted him an opportunity to testify after the forms at issue were accepted into evidence, but Rodriguez-Casillas declined.

Second, Rodriguez-Casillas did not request that the authors of the documents at issue be produced for cross-examination. The only objection he raised before the IJ was that the documents were not timely disclosed. In Richardson v. Perales, 402 U.S. 389 (1971), the Supreme Court held that a plaintiff was "precluded from now

_____

[3] Because the IJ did not specifically mention the 2013 documents, we focus only on the two sets of 2008 documents.

complaining that he was denied the rights of confrontation and cross-examination" in an administrative proceeding because he "did not take advantage of the opportunity afforded him under [the applicable regulations] to request subpoenas for the" hearsay declarants. Id. at 405; see also Yve Sumaya Amparo de Ocasio v. Ashcroft, 375 F.3d 105, 107-08 (1st Cir. 2004) (rejecting due process argument as to hearsay affidavit because petitioner did not advance objection before IJ). We cannot agree with Rodriguez-Casillas that he was denied his statutory right to "a reasonable opportunity . . . to cross examine witnesses presented by the Government," § 1229a(b)(4)(B), because we do not know whether, upon request, the IJ would have ordered that the witnesses be produced for cross-examination.[4]

Third, the forms do not exhibit the problems identified by other circuits as rendering hearsay documents inadmissible in immigration proceedings. Importantly, each of the relevant statements was recorded as being made by Rodriguez-Casillas himself rather than some third party. Accordingly, Rodriguez-Casillas had a "basis to contest the statements in the document" because he was "present for the

_____

[4] Some circuits have held that the government must show that it used "reasonable efforts" to secure a hearsay affiant. See Indrawati v. U.S. Att'y Gen., 779 F.3d 1284, 1301 n.23 (11th Cir. 2015) (collecting cases). And in Cunanan v. INS, 856 F.2d 1373 (9th Cir. 1988), the court held that the government may not "shift the burden of producing its witness onto" the alien. Id. at 1375. In highlighting Rodriguez-Casillas' failure to request an opportunity to cross-examine the authors of the immigration forms, we do not take a position contrary to these rulings. Instead, we read these decisions as did the Seventh Circuit to require that "when an alien wants to cross-examine a witness, the agency not only must issue a subpoena but also must use reasonable efforts to enforce that subpoena (which the alien may lack the resources to do)." Malave v. Holder, 610 F.3d 483, 487 (7th Cir. 2010) (emphasis added). We take no position on the procedure required had Rodriguez-Casillas asked to examine the authors of the forms.

-15-

conversation that was reported." Pouhova, 726 F.3d at 1014. The statements were contemporaneously recorded. Cf. id. at 1013-14 ("[T]he seven-year lapse between the reported conversation and the preparation of the I-213 calls the form's 'inherent reliability' into serious doubt."). "The manner of eliciting the information" is explained in the documents, which contain "the name and title of the investigator . . . , the location(s) of any investigative conversations or other searches conducted, the method used to verify the information, and the circumstances, content and results of each relevant conversation or search." Anim, 535 F.3d at 257-58 (quotations and alterations omitted). And Rodriguez-Casillas has not suggested any reason the immigration officials who authored the documents would be biased. Compare Zhen Nan Lin v. U.S. Dep't of Justice, 459 F.3d 255, 269-70 (2d Cir. 2006) (noting that foreign officials "have powerful incentives to be less than candid on the subject of their government's persecution of political dissidents") with Felzcerek, 75 F.3d at 115 (stating that U.S. immigration officials "are presumed to perform their duties properly and generally lack a motive to falsify information").[5]

In addition to an absence of suspicious elements, the immigration forms bear several independent indicators of reliability. Each Form I-215B indicates that Rodriguez-Casillas made statements under oath, after being advised that he had a

---

[5] Rodriguez-Casillas challenges one aspect of the officials' reliability: he notes that the record is silent as to their proficiency in Spanish. However, because Rodriguez-Casillas did not raise this issue before the BIA, we will not consider it. See Sidabutar v. Gonzales, 503 F.3d 1116, 1118 (10th Cir. 2007) ("[W]e generally assert jurisdiction only over those arguments that a petitioner properly presents to the BIA.").

right to remain silent and that his statements could be used against him in future proceedings. See United States v. Garcia, 78 F.3d 1457, 1466-67 (10th Cir. 1996) (statement being made under oath is one indicium of reliability). The January 2008 form indicates these warnings were read to Rodriguez-Casillas in Spanish, and the December 2008 form provides these written warnings in both Spanish and English. Rodriguez-Casillas initialed or signed each page of the forms. And he initialed a correction to his birth year in one document, indicating he actually reviewed the materials. Finally, the key fact supplied by the immigration forms—that Rodriguez-Casillas attributed his January 2008 injuries to an attack by the Aztecas gang rather than the Federales—is contained in both sets of documents. That two separate immigration officials reported the same fact in interviews conducted many months apart provides strong corroboration of that fact. See United States v. Artez, 389 F.3d 1106, 1114 (10th Cir. 2004) (noting that similar statements from two independent, potentially unreliable reporters can corroborate the information provided); Garcia, 78 F.3d at 1465 (statements may be considered more reliable when they corroborate each other).

In light of all these factors, we hold that the immigration forms challenged by Rodriguez-Casillas satisfy the standard of being "probative" and "fundamentally fair." Bauge, 7 F.3d at 1543 (quotation omitted).

**B**

Rodriguez-Casillas also argues that the BIA's adverse credibility finding was not supported by substantial evidence. "Under the substantial-evidence standard our

-17-

duty is to guarantee that factual determinations are supported by reasonable, substantial[,] and probative evidence considering the record as a whole." Niang v. Gonzales, 422 F.3d 1187, 1196 (10th Cir. 2005) (quotation omitted). "The BIA's findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." Id. (quotation omitted). An IJ must give "specific, cogent reasons" for making an adverse credibility determination. Sviridov v. Ashcroft, 358 F.3d 722, 727 (10th Cir. 2004).

We conclude that the BIA's credibility determination was adequately supported by the record. In his affidavit and testimony offered in support of his application for withholding of removal and protection under the CAT, Rodriguez-Casillas claimed that the Federales attempted to extort him, falsely accused him of a crime, and repeatedly beat him in January 2008. But, as discussed above, Rodriguez-Casillas reported to immigration officials, on separate and independent occasions, that his January 2008 injuries had been inflicted by members of the Aztecas gang. The IJ and BIA cogently explained that this contradiction was the basis of the adverse credibility finding.

Rodriguez-Casillas offers no explanation for this discrepancy other than his claim that he did in fact tell immigration officials that the Federales attacked him. We cannot say that a reasonable adjudicator would be compelled to accept this explanation. See Niang, 422 F.3d at 1196. The BIA's decision to credit the documentary evidence, which bore several indicia of reliability, see Section II.A,

-18-

supra, rather than Rodriguez-Casillas' testimony accordingly must be upheld under the substantial evidence test.

Rodriguez-Casillas also argues that the IJ failed to consider the complete record, including his documentary evidence, and that the BIA ignored this mistake. In making a credibility determination, "the trier of fact must look to the totality of the circumstances and all relevant factors." Sarr, 474 F.3d at 790 (quotations omitted). But the IJ admitted Rodriguez-Casillas' documents as an exhibit and referenced them in his oral decision. Moreover, Rodriguez-Casillas does not explain how his documentary evidence undermined the credibility determination, which was based on a conflict between his testimony and the immigration forms.

## C

Lastly, Rodriguez-Casillas argues that the BIA improperly based its denial of withholding of removal and relief under the CAT solely on an adverse credibility finding. He relies on an unpublished case, Zheng v. Holder, 507 F. App'x 755 (10th Cir. 2013) (unpublished), which held that an adverse credibility determination is not necessarily dispositive:

> Despite an adverse credibility determination, applicants for asylum can establish past persecution through independent evidence. Where independent evidence apart from the applicant's testimony and application statement exists, the agency must consider whether it is sufficient to establish a claim of past persecution. The agency may not ignore such evidence and reject the claim solely on the basis of the adverse credibility determination.

Id. at 763 (quoting Djadjou v. Holder, 662 F.3d 265, 275 (4th Cir. 2011)). We cautioned that "[a] credibility analysis should not be confused with a burden of proof

-19-

analysis, which considers and weighs all the surrounding evidence." Id. at 764 (quoting Capric v. Ashcroft, 355 F.3d 1075, 1085 (7th Cir. 2004)).

However, the IJ and BIA did consider the independent evidence Rodriguez-Casillas submitted before denying relief. As explained above, the IJ referenced Rodriguez-Casillas' documentary evidence in his oral decision. And the BIA explained that his documentary evidence did not "outweigh the impact of his earlier statements made to immigration authorities in evaluating the veracity of his claim." "Without credible testimony," the BIA held, Rodriguez-Casillas did not "meet his burden of proof for withholding of removal." Further, the BIA explained that because Rodriguez-Casillas' "withholding of removal and CAT claims are based on the same discredited testimony, the adverse credibility finding [was] fatal to both claims."

Although we agree with the statement in Zheng that an adverse credibility determination is not always fatal in immigration cases, we conclude that the IJ's credibility finding was dispositive in this particular case. We must consider the context of the IJ's adverse credibility determination. In Ismaiel v. Mukasey, 516 F.3d 1198 (10th Cir. 2008), we rejected a claim that "the BIA erred in ruling that [an] adverse credibility determination was sufficient to preclude [petitioner's] claim under the CAT." Id. at 1206. Because petitioner's CAT claim turned on the same testimony as his withholding of removal claim, our analysis was identical: "[T]he IJ and BIA could reasonably refuse to believe [petitioner's] claims of past torture and,

-20-

reviewing all the evidence, remain unpersuaded that [he] had satisfied his burden of proving that he would probably be tortured . . . ." Id.

The same is true in this case. In an attempt to bolster his claim that he was attacked by the Federales, Rodriguez-Casillas filed affidavits from a physician and a psychologist opining that his injuries and mental health were consistent with having been attacked. But neither affidavit sheds any light on the identity of the attackers.[6] Rodriguez-Casillas also filed a death certificate for his mother and a judgment of acquittal on robbery charges. But again, neither document explains the key discrepancy between Rodriguez-Casillas' earlier accounts of the January 2008 attacks and his later testimony. Because the same impeaching evidence that undermined Rodriguez-Casillas' testimony also discredits the inferences he asks us to draw from his documentary evidence, the adverse credibility finding is dispositive.

Although the BIA could have addressed the elements of Rodriguez-Casillas' withholding of removal and CAT claims in greater detail, "[t]he BIA is not required to write an exegesis on every contention. What is required is that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." Maatougui v. Holder, 738 F.3d 1230, 1242-43 (10th Cir. 2013) (quotations and alteration omitted). We are satisfied that the BIA's explanation was adequate.

---

[6] Rodriguez-Casillas states in his opening brief that he would be entitled to relief even if his attackers were a criminal gang that the Mexican government was unable to control. In his reply brief, however, Rodriguez-Casillas concedes that a claim based on gang-member persecution was not exhausted and is not at issue.

## III

For the foregoing reasons, Rodriguez-Casillas' petition for review is

**DENIED**.[7]

Entered for the Court

Carlos F. Lucero
Circuit Judge

---

[7] The government has moved to strike a letter attached to Rodriguez-Casillas' opening brief. In reviewing a decision of the BIA, the "court of appeals shall decide the petition only on the administrative record on which the order of removal is based." 8 U.S.C. § 1252(b)(4)(A). We have repeatedly declined to consider materials that are not part of the administrative record. See, e.g., Ritonga v. Holder, 633 F.3d 971, 977 n.3 (10th Cir. 2011). Because the letter is not part of the administrative record, the motion to strike is **GRANTED**.