**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 13, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

FRANKLINE BUMA BOBNYONGA,

     Plaintiff – Appellant,

v.

JEFFERSON B. SESSIONS, III, United
States Attorney General,

     Defendant – Appellant.

Nos. 17-9535 & 18-9519
(Petitions for Review)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **EBEL**, and **EID**, Circuit Judges.
_____

Frankline Bobnyonga Buma,[1] a citizen of Cameroon, entered the United States

illegally and filed an application for asylum, withholding of removal, or protection under

the Convention Against Torture ("CAT").  The immigration judge ("IJ") found Mr. Buma

removable and denied the application because he found Mr. Buma not credible.  Mr.

_____

[*] Although the above-captioned appeals were procedurally consolidated, oral argument was heard only in 17-9535 on May 15, 2018.  After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of the petition for review filed in 18-9519.  See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The petition for review filed in 18-9519 is therefore ordered submitted without oral argument.
    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Although the caption of the case lists the appellant as Frankline Buma Bobnyonga, the record materials indicate his last name is Buma.  We therefore refer to him as Mr. Buma.

Buma appealed to the Board of Immigration Appeals ("BIA"), which affirmed the IJ's ruling and dismissed Mr. Buma's appeal. On July 25, 2017, Mr. Buma petitioned this court for review of this decision in 17-9535. Mr. Buma later filed a motion to reopen, which the BIA denied. On March 22, 2018, Mr. Buma petitioned this court for review of this decision in 18-9519. We have consolidated the two petitions for review. Exercising jurisdiction under 8 U.S.C. § 1252(a), we deny both petitions.

## I. BACKGROUND

Mr. Buma is a native of Cameroon. He sought admission to the United States on February 29, 2016, without a valid visa or other entry document. He said he sought asylum. Shortly after, an asylum officer conducted a telephonic "credible fear" interview with Mr. Buma. The officer determined Mr. Buma had demonstrated a credible fear of persecution or torture if he were to return to Cameroon. Mr. Buma was then formally charged as removable under § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA"). He filed an application for asylum and withholding of removal[2] under INA § 241(b)(3), and withholding of removal under the CAT.

### A. *Immigration Court Proceedings*

The IJ found Mr. Buma removable based on his admission that he had entered the country illegally. The IJ held hearings on the application for asylum and

---

[2] The Illegal Immigration Reform and Immigrant Responsibility Act, enacted in 1996, replaced the phrase "withholding of removal" in the INA with "restriction on removal." *See Yan v. Gonzales*, 438 F.3d 1249, 1251 n.1 (10th Cir. 2006). We use "withholding of removal" consistent with the BIA's and the parties' use of the phrase in this case.

withholding of removal. Mr. Buma and his sister, Andam Buma, testified. The Department of Homeland Security ("DHS") and the IJ identified numerous inconsistencies between Mr. Buma's testimony, documentary evidence, and the asylum officer's notes from the credible fear interview. We describe Mr. Buma's claim as he presented it and a list of the key inconsistencies.

1. **Application**

Mr. Buma submitted form I-589 to apply for asylum, withholding of removal, and CAT protection. He explained in his application that his family members were members of political groups in Cameroon, including the Southern Cameroons National Council ("SCNC") and the Social Democratic Front. He said the Cameroonian government killed his mother, sister, and father because of their involvement in these groups. His mother and sister died in 1997, and his father died in 2002. Another sister, Andam, was also politically active and escaped to the United States, where she was granted asylum. His brother, Divine, escaped to the United Kingdom and was granted asylum there.

In his application, Mr. Buma asserted that he started running Divine's bar after Divine fled Cameroon. Members of the SCNC, who were Divine's friends, held meetings at the bar, but Mr. Buma himself was not involved with the SCNC. Even so, because of his association with the bar, police officers believed he was involved with the group. On December 27, 2014, police officers detained Mr. Buma, questioned him about the SCNC, and severely beat him when he could not answer. He was released due to the intervention of his uncle, Ni Mbah, and signed a document saying he would not allow

3

SCNC members in the bar.  Mr. Buma said he also was arrested on September 28, 2015, and again taken to a police station, questioned, and beaten.

The application alleged that, after this second detention, his uncle took him to a village hospital.  At some point after that, he rode in a truck with his uncle "to the border of Cameroon and Nigeria," disguised as a woman.  17-9535 AR at 596.  His uncle then "took [him] into Nigeria and handed [him] over to a man," and from there Mr. Buma travelled to Mexico and eventually the United States.  *Id.*

2. **Mr. Buma's Testimony and Documentation**

Mr. Buma testified at his hearings and submitted documents to support his application.  He affirmed the above facts about his family's involvement with the SCNC and their resulting persecution.  He said the SCNC advocates for Anglophone Cameroon's independence.

He testified that he worked in Divine's bar for five years, and that he was arrested in December 2014 and September 2015, and beaten both times.  He said that when he was released from detention the second time, on October 1, 2015, his uncle took him to a hospital, where he spent three days.  He then hid at the house of his uncle's friend for four to five months.  In February 2016, Mr. Mbah arranged his escape to Nigeria, from which he flew to Madrid with an unknown person.  Mr. Buma then flew to Mexico City by himself, where he met another man who took him to the border of the United States.

Mr. Buma submitted affidavits from his brother, Divine, and his uncle, Ni Mbah, which corroborated some of these events, and medical records of his alleged hospitalization.  As described below, each of these documents was amended and

4

resubmitted. Mr. Buma testified the affidavits were submitted a second time because of typing errors in the initial submissions. He could not explain why the two versions of the medical records were different. He also submitted copies of the death certificates of his father, mother, and sister, and pictures of their funerals.

Mr. Buma's sister, Andam, testified at the hearings about the relevant events. She corroborated Mr. Buma's claim that he was arrested in December 2014 and September 2015 because of association with SCNC members, and his description of the deaths of their parents and sister at the hands of Cameroonian authorities.

3. **Inconsistencies**

The IJ and the BIA noted multiple inconsistencies between Mr. Buma's testimony, the asylum officer's notes from the credible fear interview, and some of the documentary evidence. Andam's asylum application also cast doubt on both her testimony and Mr. Buma's claim generally.

a. *Discrepancies between testimony and asylum officer's notes*

Mr. Buma's story, as presented in his asylum application and his hearing testimony, differed from the notes the asylum officer had taken during the credible fear interview. The credible fear notes reported that:

- Mr. Buma had never been married.

- Mr. Buma said he was being targeted because he was a member of the SCNC.

- Mr. Buma mentioned his "elder brother who is now in prison." 17-9535 AR at 689.

- Mr. Buma was jailed for two weeks in September 2015.

Mr. Buma testified, in contrast, that:

- He was divorced.

- He had never been a member of the SCNC; the police only thought he was.

- His brother was never in prison and escaped to England years before Mr. Buma arrived in the United States.

- He was held for only two days in September 2015.

b. *Discrepancies among affidavits and other documents*

The first versions of Mr. Mbah's and Divine's affidavits contained dates and other information that conflicted with Mr. Buma's account of his time in Cameroon. The first version of the medical records reflected that Mr. Buma was hospitalized a few days before the dates he said he had been hospitalized. The second versions of each of these documents were submitted about a month after the first versions and before Mr. Buma's hearing. The second versions altered the discrepant information to align with Mr. Buma's account in his application.

i. Uncle Mbah's affidavits

Mr. Mbah's first affidavit said Mr. Buma was first arrested in December 2006, rather than December 2014. He also attested that after the second arrest, he took Mr. Buma to Nigeria the day after Mr. Buma was released from the hospital. The affidavit stated:

> I handed him to a friend based in Nigeria and provided him
> with all the necessary finance that will keep him
> going. . . . While in Nigeria, he kept telling me he still did
> not feel safe. And then lately he told me he found someone

6

who could help him get [out] of Nigeria to some where [sic] safer.

17-9535 AR at 573.

Mr. Mbah submitted his second affidavit along with an additional affidavit explaining that there were errors in his first submission because he had been away from home and had prepared it in a rush. His amended affidavit said Mr. Buma was first arrested in December 2014. It also aligned with Mr. Buma's testimony on the timing of his escape from Cameroon: Mr. Mbah now reported he took Mr. Buma to a village in Cameroon after the hospitalization, where Mr. Buma stayed with Mr. Mbah's friend. The new affidavit provided a new and different description of the escape:

> While in the village . . . [Mr. Buma] kept telling me he still did not feel safe. I contacted one of my friends (business partner in Nigeria) and made all the necessary arrangement[s] for his departure to Mexico. I then arranged for a truck that took me and my nephew to Nigeria and I handed him over to my friend. My friend and my nephew left for Mexico that same night.

*Id.* at 544.

#### ii. Brother Divine's affidavit

Divine's first affidavit said that he learned Mr. Buma had been arrested in December 2007 and heard he was arrested again in September 2015. His second affidavit said the first arrest happened in December 2014.

#### iii. Medical records

The first set of medical records stated that Mr. Buma had been in the hospital from September 28 through 30, 2015. The records included a "medical certificate" dated July

7

26, 2016, apparently the date the record had been requested, and a "consultation card" that seemed to have been prepared while Mr. Buma was in hospital. The consultation card was dated September 28, 2015, and recorded Mr. Buma's symptoms and the treatment he received.

The second set of medical records said that Mr. Buma had been hospitalized from October 1 through 3, 2015. A second medical certificate was dated August 9, 2016 and contained different handwriting from the first medical certificate, but the same doctor had signed and stamped it. The first page of the consultation card was dated October 1, 2015, and there was now an additional page, dated October 3, 2015, documenting Mr. Buma's discharge.

c. *Other discrepancies*

Andam's asylum application and the death certificate of Mr. Buma's father reflected additional discrepancies.

Andam's 2003 application for asylum in the United States was introduced when she testified. She had listed her siblings on this form as: Peter, Gladys, Anastasia, Gerald, Ransom, and Brian. When she testified in the IJ proceeding here, Andam said she did not have a brother named Peter or Ransom, but she did have brothers named Frankline and Charles. She said Gerald had changed his name to Divine. She did not know why she had not listed Frankline or where the names Peter and Ransom came from. She testified that she was having psychological problems at the time of her asylum application, and may have used the name Ransom because it was the name of one of the police officers who beat her. A psychological report attached to her asylum application

8

confirmed that Ms. Buma had post-traumatic stress disorder ("PTSD") in 2003. It said she had symptoms including "flashbacks with auditory hallucinations of her abusers, startle responses, [and] memory disturbance." 17-9535 AR at 515.

Mr. Buma submitted his father's death certificate with his application. The death certificate listed his paternal grandmother as a witness, but Mr. Buma testified that this grandmother was not alive when his father died.

## B. *IJ and BIA Decisions – 17-9535*

The IJ denied Mr. Buma's application and found neither he nor his sister was a credible witness. The BIA affirmed the IJ's decision.

### 1. **IJ Decision**

The IJ denied asylum because he found Mr. Buma was not credible and "because the other evidence of record fail[ed] to carry his burden of proof" to show he qualified for asylum. 17-9535 AR at 117. The IJ denied withholding of removal and protection under the CAT for the same reasons.

The IJ described the evidence presented, including the discrepancies detailed above. He said the differences between the two sets of medical records, combined with "peculiar similarities . . . raise[d] several concerns, which [Mr. Buma] was unable to adequately explain." *Id.* at 114. The IJ found these documents "damaging to [Mr. Buma's] credibility." *Id.* He also found that Mr. Buma had "failed to provide a reasonable explanation" for the alleged errors in the original affidavit of Mr. Mbah. *Id.* at 116.

9

"Perhaps most importantly," the IJ found the omission of Mr. Buma from Andam's asylum application "calls into question [Mr. Buma's] entire narrative regarding his family's persecution at the hands of Cameroonian government forces." *Id.* He found Andam's "inability to provide any reasonable explanation" for the discrepancies in her asylum application to be "fatal to her own credibility as a witness" and to undermine the core of Mr. Buma's claim. *Id.* at 117.

2. **BIA Decision**

The BIA, speaking through a single member, upheld the IJ's decision. It said the IJ's adverse credibility finding was not "clearly erroneous" because the IJ had "cited numerous internal and external inconsistencies and discrepancies . . . and found that [Mr. Buma's] frequent explanation that these issues were due to mistakes insufficient to reconcile them." BIA Decision at 3 (attached to 17-9535 Aplt. Br.). The BIA held the IJ "reasonably found" unpersuasive Mr. Buma's explanation for the discrepancies between his testimony and the first versions of the amended documents. *Id.* at 4. It found the "discrepancies in the [medical] documents undermine their persuasiveness and [Mr. Buma's] credibility," and Andam's testimony likewise detracted from Mr. Buma's credibility. *Id.*

The BIA also found that Mr. Buma's arguments contesting the credibility findings were not persuasive. It held that, "[i]n the absence of credible testimony, the [IJ] properly denied [Mr. Buma's] asylum and withholding of [removal] claims because he did not present sufficient reliable and objective evidence independent of his discredited testimony to meet his burdens of proof," *id.* at 5, and he also did not meet his burden of

proof for protection under the CAT, *id.* at 6. The BIA dismissed as unfounded Mr.

Buma's claims that the IJ had exhibited bias and prejudice.[3]

## C. *Motion to Reopen – 18-9519*

Five months after the BIA's decision, Mr. Buma moved to reopen the BIA

proceeding based on two grounds: (1) he was mentally incompetent during the IJ

hearings, and (2) the conditions in Cameroon had changed since his removal order.

As explained below, this motion was untimely because it was submitted more than 90

days after the BIA's decision. Attached to the motion were medical files showing

diagnoses starting on January 13, 2017 of psychosis and schizophrenia. His last

hearing before the IJ ended on September 20, 2016. Also attached were copies of

articles about government crackdowns on Anglophone protests in Cameroon. One

article from the *Watchdog Tribune*, an English-language Cameroonian newspaper

that Mr. Buma described as a government propaganda publication, described a

crackdown on SCNC members. It specifically mentioned "Divine Buma and

Franklin Bobnyonga of the Buma[] family," who have "been on the run several

years . . . [and] are still wanted by the police in Bamenda." 18-9519 AR at 135. The

article included a picture of a man identified as Mr. Buma.

The BIA denied the motion. As to Mr. Buma's mental competency, the BIA

declined to exercise its discretion to reopen the proceedings. As to the country

---

[3] The BIA overturned the IJ's finding that the asylum application was frivolous because it did "not comport with our precedent for making this determination," which requires a factor-by-factor analysis. BIA Decision at 6. This decision is not on appeal.

11

conditions, it found Mr. Buma was "relying on previously discredited claims" that he would be persecuted based on his or his family's involvement in the SCNC. *Id.* at 2.

## II.  DISCUSSION

We deny both petitions for review.

### A. *Petition 17-9535*

We deny petition 17-9535 because we uphold the BIA decision under the substantial evidence standard of review.

### 1.  Standard of Review

"On appeal of a BIA order, the scope of our review is governed by the form of the BIA decision." *Htun v. Lynch*, 818 F.3d 1111, 1118 (10th Cir. 2016) (quotations and alteration omitted).  If a three-member panel of the BIA issues a full opinion, "the BIA opinion completely supercedes the IJ opinion for purposes of judicial review." *Sidabutar v. Gonzales*, 503 F.3d 1116, 1123 (10th Cir. 2007) (alterations and quotations omitted).  If, on the other hand, only a single member of the BIA affirms a decision without an opinion, "the IJ opinion constitutes the decision of the agency for purposes of appeal." *Id.*  When a single member of the BIA dismisses an appeal and issues a decision, as in this case, "we review the order as the final agency determination and limit our review to the grounds relied upon by the BIA." *Htun*, 818 F.3d at 1118.  But "we may also consult the IJ's explanation," especially when "the BIA repeats a condensed version of [the IJ's] reasons while also relying on the IJ's more complete discussion." *Ritonga v. Holder*, 633 F.3d 971, 974 (10th Cir. 2011) (alteration in original) (quotations omitted).

12

We review the BIA's findings of fact under a substantial-evidence standard. *Gutierrez-Orozco v. Lynch*, 810 F.3d 1243, 1245 (10th Cir. 2016). "[O]ur duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole." *Karki v. Holder*, 715 F.3d 792, 800 (10th Cir. 2013) (quotations omitted). The IJ's credibility assessment, as confirmed by the BIA, is a factual finding that "will ordinarily be given great weight." *Htun*, 818 F.3d at 1118-19 (quotations omitted). It should not be reversed "unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* at 1119 (quotations omitted). "Under this standard, we do not weigh evidence or independently assess credibility." *Id.* Even if "we disagree with the [BIA's] conclusions, we will not reverse if they are supported by substantial evidence and are substantially reasonable." *Id.* (alteration in *Htun*) (quotations omitted).

2. **Legal Background**

Mr. Buma sought relief in the immigration court on three grounds. We provide background on each.

a. *Asylum*

To be eligible for asylum, an alien must show that he is a "refugee" under the INA. *See* 8 U.S.C. § 1158(b)(1)(A). An alien may do so by demonstrating past persecution or a well-founded fear of future persecution based on a statutorily protected ground. *Id.* § 1101(a)(42)(A). These protected grounds include "race,

religion, nationality, membership in a particular social group, or political opinion."

*Id.*

The REAL ID Act of 2005 sets the burden an applicant must carry to prove refugee status. The applicant's testimony may be sufficient to satisfy this burden, "but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." *Id.* § 1158(b)(1)(B)(ii). The credibility determination must be made "[c]onsidering the totality of the circumstances, and all relevant factors," including the "demeanor, candor, or responsiveness of the applicant or witness," and the "consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made)." *Id.* § 1158(b)(1)(B)(iii). Any inconsistencies, inaccuracies, or falsehoods can be considered "without regard to whether [they] go[] to the heart of the applicant's claim, or any other relevant factor." *Id.*

b. *Withholding of removal*

Withholding of removal forbids removal of an alien to a country where persecution may occur. *See Ismaiel v. Mukasey*, 516 F.3d 1198, 1204 (10th Cir. 2008). The Attorney General may not remove an alien if the alien has shown that his or her "life or freedom would be threatened in [the country of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The proof required for withholding of

14

removal is higher than it is for asylum.  An applicant who fails to establish eligibility for asylum therefore cannot qualify for withholding of removal.  *See Ustyan v. Ashcroft*, 367 F.3d 1215, 1218 (10th Cir. 2004).

          c.  *CAT*

The CAT prohibits removal to a country where an alien would probably face torture.  *See Ismaiel*, 516 F.3d at 1204.  The applicant must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c)(2).  "Relief under the CAT is mandatory if the convention's criteria are satisfied."  *Ismaiel*, 516 F.3d at 1204.

## 3.  Analysis

Substantial evidence supported the conclusion that Mr. Buma is not credible and has not otherwise carried his burden of showing he is eligible for any of the three forms of relief.  We therefore deny the petition for review.

The agency's credibility determination was reasonable.  Although the individual inconsistencies described above may include some relatively minor ones, together they provide reason to doubt Mr. Buma's entire narrative.  All three of Mr. Buma's most relevant supporting documents contained inconsistencies that were later corrected.  For example, both Mr. Mbah's and Divine's first affidavits contradicted Mr. Buma's testimony identifying the date of his initial arrest.  Mr. Mbah's first affidavit also said he took Mr. Buma to Nigeria the day after Mr. Buma was released from the hospital, but Mr. Buma testified he spent four or five months in a village in Cameroon.  And the two versions of the hospital records raise questions about whether either version is legitimate

15

and whether Mr. Buma was hospitalized at all.  The multiple discrepancies between the notes of the credible fear interview and Mr. Buma's testimony at the hearing further suggest that Mr. Buma was not a credible witness.[4]  Given this litany of inconsistencies, we do not believe that "any reasonable adjudicator would be compelled to conclude" Mr. Buma was credible.  *Htun*, 818 F.3d at 1119 (quotations omitted).

Substantial evidence also supported the conclusion that Andam Buma was not credible.  The omission of Mr. Buma's name from Andam's asylum application raises questions about their relationship.  It was reasonable for the agency to consider this omission despite Andam's PTSD explanation.  And the credibility of Andam could properly be used to evaluate Mr. Buma's credibility.  *See* 8 U.S.C.

---

[4] Mr. Buma seems to argue that the asylum officer notes were inadmissible and, if admissible, should have been used only for impeachment purposes rather than for direct evidence.  He has not preserved the argument that the notes were inadmissible, and the record shows they were in fact used only for impeachment.

The Government moved to have these notes admitted into evidence at Mr. Buma's hearing, and counsel for Mr. Buma said, "I believe we should admit this because I think it[] substantiates my client's case," but objected "on the basis that the government should have filed this prior to the hearing as evidence."  17-9535 AR at 281.  The IJ then admitted the notes "solely as rebuttal evidence in this case, but not necessarily for the underlying truth in the matter."  *Id.*

Mr. Buma may present an argument on appeal only when he presented "the *same specific legal theory* to the BIA."  *Garcia-Carbajal v. Holder*, 625 F.3d 1233, 1237 (10th Cir. 2010).  The failure to exhaust a legal theory before the BIA "precludes our jurisdiction."  *Torres de la Cruz v. Maurer*, 483 F.3d 1013, 1018 (10th Cir. 2007).  Mr. Buma argues on appeal that an asylum officer's notes from a credible fear interview are inherently unreliable and should only be admitted in immigration court when the petitioner has already referenced them.  He did not make this argument to the BIA, so we cannot consider it.

Mr. Buma has preserved an argument that the notes were used for purposes other than impeachment, but our review of the record shows this argument lacks merit because the notes were used as a basis for the credibility finding, not for the truth of their contents.

16

§ 1158(b)(1)(B)(iii) (factors considered in credibility determination can include "demeanor, candor, or responsiveness of the applicant or *witness*," and the "consistency between the applicant's or *witness's* written and oral statements" (emphases added)).

Although the affidavits and documents do not directly contradict Mr. Buma's contention that he was imprisoned and beaten for imputed political opinion, under the REAL ID Act inconsistencies do not have to go to "the heart of the applicant's claim, or any other relevant factor," to be considered in making the credibility determination. 8 U.S.C. § 1158(b)(1)(B)(iii). The multiple inconsistencies here, including those not related to the "heart" of Mr. Buma's claim, provided sufficient evidence for the IJ and the BIA to conclude that Mr. Buma was not truthful in his application. *See Diallo v. Gonzales*, 447 F.3d 1274, 1283 (10th Cir. 2006) (affirming the IJ's adverse credibility determination even though the two versions of petitioner's claim were "more similar than different.") "It cannot be overstated that our review of the IJ's credibility findings is highly deferential." *Majidi v. Gonzales*, 430 F.3d 77, 79 (2d Cir. 2005). Because a reasonable adjudicator would not be "compelled" to conclude that either Mr. Buma or Andam was a credible witness, we affirm the agency's credibility determination. *See Htun*, 818 F.3d at 1119.

Given the credibility findings, the BIA correctly determined there was insufficient evidence for Mr. Buma to show he is eligible for asylum under the INA as a refugee. An "adverse credibility determination is not always fatal in immigration cases," but "we conclude that the IJ's credibility finding was dispositive in this particular case."

17

*Rodriguez-Casillas v. Lynch*, 618 F. App'x 448, 458 (10th Cir. 2015).[5] As explained

above, the majority of the documents submitted by Mr. Buma undermined his claim by

contradicting certain aspects of his story. The few additional documents he submitted,

such as pictures allegedly showing his family at his relatives' funerals, were not sufficient

to overcome his credibility problem or carry his burden of proof for his asylum claim.

Mr. Buma has also necessarily failed to satisfy the higher burdens of proof for

withholding of removal or CAT protection. *See Ustyan*, 367 F.3d at 1218; *Ismaiel*, 516

F.3d at 1204.[6]

## B. *Petition 18-9519*

We deny petition 18-9519 because (1) we do not have jurisdiction to consider the

BIA's discretionary decision refusing to reopen removal proceedings as to Mr. Buma's

mental competency, and (2) the BIA did not abuse its discretion in concluding that Mr.

Buma has not shown changed country conditions in Cameroon that would excuse the

untimeliness of his motion to reopen.

### 1. **Legal Background and Standard of Review**

An alien must usually file a motion to reopen within 90 days of a final

administrative order of removal. 8 C.F.R. § 1003.2(c)(2). But the BIA also may "at

---

[5] Although not precedential, we find the reasoning of this unpublished opinion instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

[6] Mr. Buma also argues he was deprived of due process because the IJ was not a neutral arbiter. This argument is without merit. Mr. Buma has not shown the IJ was biased or otherwise deprived him of a fair hearing.

any time reopen or reconsider on its own motion any case in which it has rendered a decision." *Id.* § 1003.2(a). A party may request the BIA exercise this discretion in the form of a written motion. *Id.* Moreover, if the alien has applied for asylum or withholding of removal, a motion to reopen may be filed later when it is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered. *Id.* § 1003.2(c)(3)(ii). The evidence of changed country conditions must be "material and was not available and could not have been discovered or presented at the previous hearing." *Id.*

When we have jurisdiction to review the BIA's denial of a motion to reopen, we review for an abuse of discretion. *Qiu v. Sessions*, 870 F.3d 1200, 1202 (10th Cir. 2017). "The BIA abuses its discretion when its decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements." *Maatougui v. Holder*, 738 F.3d 1230, 1239 (10th Cir. 2013) (quotations omitted). "[C]ommitting a legal error or making a factual finding that is not supported by substantial record evidence is necessarily an abuse of discretion." *Qiu*, 870 F.3d at 1202 (quotations omitted). "[M]otions to reopen immigration cases are plainly disfavored," and petitioners bear a "heavy burden to show the BIA abused its discretion" in denying a motion to reopen. *Maatougui*, 738 F.3d at 1239 (brackets and quotations omitted).

2.  **Analysis**

a.  *Motion to reopen regarding mental competency – no jurisdiction*

We do not have jurisdiction to review Mr. Buma's motion to reopen based on

mental incompetency.  The BIA correctly construed this part of the motion as a

"request that [it] exercise [its] discretionary authority to reopen proceedings sua

sponte" under 8 C.F.R. § 1003.2(a).  18-9519 AR at 3.  It declined to do so.  "[W]e

do not have jurisdiction to consider [a] petitioner's claim that the BIA should have

sua sponte reopened the proceedings . . . because there are no standards by which to

judge the agency's exercise of discretion."  *Jimenez v. Sessions*, 893 F.3d 704, 708-

09 (10th Cir. 2018), (alterations in original) (quotations omitted).  On petition 18-

9519, therefore, we have jurisdiction to review only the BIA's denial of Mr. Buma's

motion to reopen based on changed country conditions.[7]

b.  *Motion to reopen based on changed country conditions – no abuse of discretion and inadequate briefing*

The BIA did not abuse its discretion in finding the material submitted by Mr.

Buma did not "establish the existence of material, changed conditions in Cameroon"

---

[7] Mr. Buma argues we have jurisdiction over both parts of this petition under the "notion that even foreign nationals have a right to minimal procedural due process rights." 18-9519 Aplt. Br. at 16.  Although we have jurisdiction to review "constitutional claims or questions of law" raised in a petition of review, 8 U.S.C. § 1252(a)(2)(D), aliens have only "the minimal procedural due process rights for an opportunity to be heard at a meaningful time and in a meaningful manner," *Salgado-Toribio v. Holder*, 713 F.3d 1267, 1271 (10th Cir. 2013) (quotations omitted).  Mr. Buma's due process argument fails because there is no evidence that he had any mental health problems until almost four months after the last hearing before the IJ. There is no evidence for his contention that he has been prescribed psychiatric medications "[s]ince the beginning of [his] detention in March 2016." 18-9519 Aplt. Br. at 19.

and therefore could not serve to exempt the motion to reopen from the 90-day time limit. 18-9519 AR at 8. Moreover, Mr. Buma has waived this issue through inadequate briefing.

Mr. Buma submitted: (1) the article from the *Watchdog Tribune*, (2) articles from six international news outlets about the Anglophone separatist movement in Cameroon, (3) a report of statements by United Nations experts on the violence against the Anglophone minority in Cameroon, and (4) a report from Amnesty International about mass arrests of Anglophone protestors in Cameroon. Mr. Buma said these documents showed a "recent eruption in violence towards pro-Anglophone [Cameroonians] and [the] establishment of a threatening secession[ist] movement." *Id.* at 52. He argued the evidence showed the Cameroonian government's "changed attitude toward the SCNC and the persecution Mr. Buma would undoubtedly suffer upon his forced return" to Cameroon. *Id.* We uphold the denial of the motion to reopen based on changed country conditions for two reasons.

First, the BIA did not abuse its discretion in concluding the documents did not provide "material, non-cumulative information" related to Mr. Buma's claims that the Cameroonian government has persecuted or will persecute him because of his perceived political affiliation or because he is an English speaker. *See Maatougui*, 738 F.3d at 1241. As the BIA noted, the *Watchdog Tribune* article "reiterate[d] many of [Mr. Buma's] previously discredited claims." 18-9519 AR at 7 n.1. The article described the Buma family as supporters of the SCNC and named Divine and Mr. Buma as "wanted by

the police." *Id.* at 135. This information was already included in Mr. Buma's application for asylum, withholding of removal, and protection under the CAT.

We denied a petition for review in similar circumstances in *Wei v. Mukasey*, 545 F.3d 1248 (10th Cir. 2008). In that case, although the petitioner submitted new documents with her petition to reopen, the documents contained the same "pertinent content" available during the IJ proceedings. *Id.* at 1254. We held the BIA "did not abuse its discretion by refusing to hear the same argument for asylum for the third time." *Id.* at 1255. We similarly hold the BIA did not abuse its discretion by refusing to reopen Mr. Buma's case based on information he had previously presented.

Nor did the submitted documents support Mr. Buma's argument that there was a material, changed condition in Cameroon because the government had shifted to persecuting English speakers. The BIA acknowledged the documents "indicate[d] that English-speaking areas have been subject to increased government scrutiny and some harassment," but concluded they did not "establish that English speakers are being subject to persecution solely on the basis of their primary language." 18-9519 AR at 8. This "rational explanation" for the BIA's decision was not an abuse of discretion. *See Maatougui*, 738 F.3d at 1239.

Second, Mr. Buma has waived this issue through inadequate briefing. Mr. Buma has not explained why the evidence submitted establishes changed country conditions. His brief asserts only that he "provided documentation that the persecution of Anglophones in Cameroon by the current government is materially worse than it was when he initially applied for asylum in March 2016." 18-9519

22

Aplt. Br. at 23. This conclusory statement does not explain how the documents establish a material change in country conditions, why the BIA's conclusion was incorrect, or how the alleged changed conditions are material to his claims for relief. He states the *Watchdog Tribune* article is his "strongest evidence" of changed country conditions without explaining why this is so. *Id*. He therefore has waived any appellate challenge to the BIA's denial of his motion to reopen based on changed country conditions by failing to make any argument about how the BIA erred. *See United States v. Fisher*, 805 F.3d 982, 991 (10th Cir. 2015) ("[A]n issue mentioned in a brief on appeal, but not addressed, is waived." (quotations omitted)).

## III.  CONCLUSION

For the foregoing reasons, we deny Mr. Buma's petitions for review in 17-9535 and 18-9519.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

23